**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**PATRICIA D. LEWIS,**

    **Plaintiff,**

      **v.**

**GOVERNMENT OF THE DISTRICT OF COLUMBIA,** *et al.*,

    **Defendants.**

**Civil Action No.  15-521 (JEB)**

---

<u>**MEMORANDUM OPINION**</u>

Happily ensconced in the District of Columbia's new Consolidated Forensic Sciences Laboratory, the city's Office of the Chief Medical Examiner (OCME) decided that all employees stationed there had to take a drug test as a condition of continued employment.  Plaintiff Patricia Lewis, formerly employed as a human-resources adviser with OCME, balked.  Objecting on privacy grounds, she refused to take the test and was fired nine months later.  She then brought this suit against the District, former Mayor Vincent Gray, and a number of its officials. Although the crux of her grievance lies with the drug testing, her Complaint is muddied by a skein of claims under the U.S. Constitution, federal statutes, state statutes, and state common law.  A subset of Defendants – the District, former Mayor Gray, and OCME's Chief of Staff, Beverly Fields – now moves to dismiss.  The Court will grant in part and deny in part their Motion.

**I.**      **Background**

Before her termination in 2013, Lewis held the job of "[Human Resources] Advisor, Management Liaison Specialist" in the city's Office of Chief Medical Examiner.  <u>See</u> Am.

Compl., ¶ 20.  OCME's duties include autopsies as well as other forensic and medicolegal investigations.  See generally D.C. Code Ann. § 5-1401 *et seq.*  When she was hired, OCME was located in an office building on Massachusetts Avenue in Southeast Washington.  See id., ¶ 24. Sometime in or before July 2012, the city informed OCME's workforce that it would be moved to a new facility: the city's Consolidated Forensic Sciences Laboratory.  See id., ¶ 21.  The new laboratory, which opened in October 2012, was designed to house under one roof a number of city departments, including OCME, the Department of Forensic Sciences, and several divisions of the Metropolitan Police Department, such as the Firearms and Fingerprint Examination Division, the DNA laboratory, and the Forensic Sciences Services Division.  See D.C. Council Resolution No. 19-726 § 2(b) (Dec. 4, 2012).

During a staff meeting on July 18, 2012, an attorney for the city, Charles Tucker, informed OCME employees that, as a condition of their ability to relocate to the new laboratory, and thus to maintain their jobs, they would be required to consent to a set of background checks detailed in a 2012 Mayor's Order.  See Am. Compl., ¶¶ 21, 22, 28 (citing Mayor's Order 2012-84); Def. Mot., Exh. A (Mayor's Order 2012-84).  The Order indicated that the city's Department of Human Resources possessed the authority to require employees with "a duty station" at the new laboratory to submit to some combination of "background checks, investigations, mandatory criminal background checks, and tests for controlled substance use." Mayor's Order 2012-84 at 2.  Tucker stated that employees had until 4:00 p.m. that day to sign a "Notification of [] Drug and Alcohol Testing Form," which also required disclosure of "any current medications," or risk being fired.  See Am. Compl., ¶¶ 21, 22.

Lewis "immediately protested" both the requirements themselves and the short timeframe that employees were given to respond.  See id., ¶ 23.  She alleges that she made her objections

known "verbally" to an unspecified audience on July 18, 2012, and "in writing" in a letter to

Tucker two days later.  See id., ¶¶ 23, 24.  In the letter, Lewis stated that she was "hired into a

non-sensitive position that has not been reclassified, nor designated as high risk," suggesting that

certain inquiries into her background, like the drug test, were unwarranted.  See id., ¶ 23.

Plaintiff received a written response from Tucker on August 30, 2012, which stated definitively

that, "due to the relocations of your position to the new facility, you will be subject to mandatory

criminal background checks and testing for controlled substance use in accordance with [M.O.

2012-84]."  Id., ¶ 27.  According to Lewis, she refused to "submit[] to the background check,"

including a drug test.  See id., ¶ 24.

Plaintiff claims that, as a consequence of her refusal to comply with those requirements,

she suffered repeated mistreatment at the hands of the city and its agents.  The first set of wrongs

related to her working conditions.  Beginning on October 23, 2012, she was forced to "remain at

the abandoned [OCME] Office" building – i.e., her former duty station prior to the relocation –

while the rest of the OCME workforce departed for the new facility.  See id., ¶ 24.  She remained

working there, alone, until January 3, 2013, when she received a proposed letter of termination

from her employer.  See id., ¶¶ 24, 57.  More on that later.  During that time, the facility lacked

"adequate heat" and afforded her inadequate access to her office and the bathroom, given what

she claims was her "known disability-- difficulty of traversing stairs."  Id., ¶ 24.  The problem,

according to Plaintiff, was that the "elevators were largely inoperable[,] which meant that [she]

had to climb the stairs to get to her office on the second floor."  Id., ¶ 55.  Furthermore, because

the "bathroom facilities on the second floor were disabled because the ceiling in the bathroom

had fallen," Plaintiff was forced "to make the difficult climb up and down two flights of stairs

just to use the bathroom."  Id., ¶ 56.

She also alleges that certain city employees retaliated against her, at times in rather odd ways.  One grievance is that OCME's Chief of Staff, Beverly Fields, directed her executive assistant to "stealthily and surreptitiously enter the suite occupied by Ms. Lewis without identifying herself," ostensibly to either scare or intimidate Plaintiff.  Id., ¶¶ 58, 59.  These spectral visitations apparently happened "on several occasions."  Id.  In one instance, Lewis "heard noises and shouted out for the individual to identify himself or herself."  Id.  The assistant, who was apparently "hiding in the supply room next to [Plaintiff's] office space, came out and said to [Plaintiff], 'While you're calling out for someone to identify themselves you could already be dead.'"  Id.  The assistant then left.  Id.

She also complains of harm to her reputation.  Specifically, she asserts that an OCME employee posted Plaintiff's picture at a guard station at the new laboratory with a caption indicating that she had "fail[ed] the background check," even though she had simply refused to submit to one.  Id., ¶¶ 24, 60.

Finally – and perhaps most importantly – Lewis claims that the city fired her because of her refusal to undergo the background checks and her decision to "speak[] up and protest[]" the background-check requirement.  Id., ¶¶ 5, 25, 98.  The District issued its proposed letter of termination on January 3, 2013, see id., ¶ 57, and terminated her on April 9.  See id., ¶ 5.  (The Complaint leaves unexplained what Plaintiff was doing or where she was working between January 3, 2013, and her eventual termination, but she appears to concede that she no longer went to work in the abandoned office building after receiving the proposed-termination letter. See id., ¶ 24).

She then brought this 10-count suit against the District, certain officials, and various city employees, alleging violations of: (1) the First, Fourth, and Fourteenth Amendments of the U.S.

4

Constitution (Counts IX, II, and V); (2) various federal and state civil-rights statutes, including

Title VII of the Civil Rights Act, the Genetic Information Nondiscrimination Act, the Americans

with Disabilities Act, and the D.C. Human Rights Act (Counts III, VII, VIII, and IV); and (3)

state law prohibiting wrongful termination, intentional infliction of emotional distress, and

defamation (Counts I, VI, and X).  Certain Defendants – comprising the District, former Mayor

Gray, and Beverly Fields – now move to dismiss.  (Other Defendants subsequently filed separate

motions, which the Court does not address here.)

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a

complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants'

Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must

grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow

v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United

States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms.,

Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to

impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005),

and she must thus be given every favorable inference that may be drawn from the allegations of

fact.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6)

motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Twombly, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n., 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).  For a plaintiff to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In evaluating the sufficiency of Plaintiff's Complaint under Rule 12(b)(6), the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). The Court may thus consider those materials on a motion to dismiss without treating the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

## III.   Analysis

As is frequently the case when counsel toss any conceivable claim into the cauldron and give it a mighty stir, the Complaint here often looks more like a product of Macbeth's witches than a well-drafted legal pleading.  Because the Court has thus been unable to tease out a clear organizational thread therein, it finds the cleanest way to address Plaintiff's causes of action – albeit out of order – is to begin with her Constitutional claims, proceed to her statutory claims, and end with her remaining common-law claims.

Before addressing the merits of those claims, however, the Court will dismiss Plaintiff's Count XI for "DECLARATORY and INJUNCTION [*sic*] RELIEF."  Am. Compl. at 28.

Requests for declaratory judgments and injunctions are not "freestanding cause[s] of action" but rather invoke "form[s] of relief to redress the other claims asserted by Plaintiff." Base One Technologies, Inc. v. Ali, 78 F. Supp. 3d 186, 199 (D.D.C. 2015). Such dismissal does not limit the remedies to which Lewis may be entitled, of course, should she succeed on one or more of her claims. See Thorp v. D.C., No. 15-195, 2015 WL 6769071, at *12 (D.D.C. Nov. 5, 2015).

    A. Constitutional Claims (Counts II, V, and IX)

Lewis presents three counts that invoke the U.S. Constitution in one form or another. Although she has not specifically so pled, the Court presumes that Plaintiff means to rely on 42 U.S.C. § 1983, and that she aims to hold the District liable for its actions under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978) (holding that a municipality may be sued under § 1983 for injuries arising from execution of a government's policy or custom). Among other failings, each count does not contain only one distinct constitutional violation. The Court will thus proceed amendment by amendment, rather than count by count, in addressing Plaintiff's claims. It ultimately concludes that the causes of action based on the Fourth and First Amendments will survive, but that those based on the due-process clauses of the Fifth and Fourteenth Amendments will not.

    1. *Fourth Amendment (Count II)*

The true gravamen of Lewis's digressive Complaint is her challenge to the drug-testing requirement. She asserts that the city's blanket and mandatory background check for all laboratory employees – which included a drug test – is an "unreasonable search" under the Fourth Amendment, see Am. Compl., ¶ 49; Opp. at 7, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const., Amend. IV. The grist of her dispute is that she and her coworkers

were forced to either submit to an unconstitutional practice – a suspicionless drug test – or face termination as a consequence.

It is helpful to view the claim as a subspecies of the doctrine of "unconstitutional conditions," in which the government improperly seeks to "extract[] . . . consent" for an invalid search "through a threatened withholding of a benefit," like public employment. <u>Dubbs v. Head Start, Inc.</u>, 336 F.3d 1194, 1214 (10th Cir. 2003); <u>accord</u> <u>United States v. Scott</u>, 450 F.3d 863, 868 (9th Cir. 2006) ("Government employees . . . do not waive their Fourth Amendment rights simply by accepting a government job; searches of government employees must still be reasonable."); <u>Burka v. New York City Transit Auth.</u>, 747 F. Supp. 214, 223 (S.D.N.Y. 1990) (concluding that city employees fired for refusing to submit to unconstitutional drug tests were entitled to seek compensation and correction of employment records).

In considering the Fourth Amendment question, the Court begins with the obvious: "For the most part, [the Supreme Court has] required that a search be based upon probable cause." <u>O'Connor v. Ortega</u>, 480 U.S. 709, 722 (1987). But in the context of a government employer's search of an employee where that "search is not used to gather evidence of a criminal offense," the Court has concluded that probable cause is not required. <u>Id.</u> at 724-25. The search, rather, must be judged against the standard of "reasonableness under all the circumstances," <u>id.</u> at 725-26, which typically means that it "must be based on individualized suspicion of wrongdoing." <u>Chandler v. Miller</u>, 520 U.S. 305, 313 (1997).

In certain limited circumstances, however, "where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." <u>Id.</u> at 314 (internal quotation marks and

citation omitted); see Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 668 (1989)

(holding that subset of U.S. Customs Service employees may be required to submit to

mandatory, suspicionless drug tests).

Here, the government does not dispute that the drug test is a Fourth Amendment search,

nor does it argue that Lewis's privacy interests are diminished for any reason apart from her

position.  Defendants instead emphasize that certain interests pertaining to the city's

management of the laboratory and its multi-agency workforce justify recourse to blanket drug

testing.  See Mot. at 11.

In so doing, the District relies on an amorphous bucket of cases bearing the "special

needs" moniker, wherein warrantless or suspicionless searches may be justified where the

government's interests lie "'beyond the normal need for law enforcement'" and when "'it is

impractical to require a warrant or some level of individualized suspicion in the particular

context.'"  Stigile v. Clinton, 110 F.3d 801, 808 (D.C. Cir. 1997) (quoting Von Raab, 489 U.S. at

665-66).  In particular, Defendants argue, a suspicionless testing program is justified here

because of the city's overall interest in "maintaining a secure [laboratory] facility" and

"reduc[ing] or eliminat[ing] any fraud, waste, and abuse of individuals who have a duty station

[there]," as well as the Department of Forensic Science's specific interest, mandated by Mayoral

Order, in "safeguard[ing] evidence and samples in [DFS's] custody."  Mot. at 11.

There can be no doubt that the city intends its drug test to "'serve[] special governmental

needs, beyond the normal need for law enforcement,'" Stigile, 110 F.3d at 808 (quoting Skinner

v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989)), because the stated goal is to make

the facility and its assets more secure by ensuring its workforce is free from substance abuse.

The dispositive question, then, is whether the city's search is reasonable, which "is determined

by balancing 'the public interest in the . . . testing program against the privacy concerns

implicated by the tests, without reference to [the] usual presumption in favor of the procedures

specified in the Warrant Clause.'"  Id. at 803 (quoting Von Raab, 489 U.S. at 679).

As a preliminary observation, the city has an undeniable interest in eliminating "fraud,

waste and abuse" among all of its employees, whether they work in the laboratory or not.  See,

e.g., D.C. Code § 1–615.51 (establishing protections for whistleblowers who "report waste,

fraud, abuse of authority, violations of law, or threats to public health or safety").  Because

Defendants have not, at this stage of the proceedings, had an opportunity to make clear how the

city's general interest in curbing corruption applies with particularity to individuals stationed at

the laboratory, the Court cannot now find this interest sufficient to justify a "special needs"

search.

As for the remaining interests – maintaining a secure facility (generally) and safeguarding

evidence and samples in the custody of DFS (specifically) – those, too, furnish an inadequate

basis at this stage to render Plaintiff's claim deficient as a matter of law.  For one thing, the city

has not yet explained why those interests justify compulsory drug testing for all employees

stationed at the laboratory, regardless of which agency they work in, what position they occupy,

or what level of access they have within the facility.  See Harmon v. Thornburgh, 878 F.2d 484,

490 (D.C. Cir. 1989) ("[T]he government may search its employees only where a clear, direct

nexus exists between the nature of the employee's duty and the nature of the feared violation.").

Although facts submitted on summary judgment may well reveal this justification to be sound,

the Court cannot say at this point that Defendants' "proffered special need for drug testing" is so

patently "substantial—important enough to override the individual's . . . privacy interest [and]

sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized

suspicion." <u>Chandler</u>, 520 U.S. at 318 (1997); <u>see also</u> <u>Douglas v. New York State Adirondack</u>

<u>Park Agency</u>, 895 F. Supp. 2d 321, 352 (N.D.N.Y. 2012) (concluding that the special-needs

doctrine's "fact-specific analysis is [more] appropriately decided on a motion for summary

judgment").

   To the extent, furthermore, that the city means to suggest that drug testing is justified

simply because an individual works in a facility that also houses evidence from ongoing

investigations, the opinion of <u>Romaguera v. Gegenheimer</u>, No. 91-4469, 1996 WL 229836 (E.D.

La. May 3, 1996), is instructive.  In that case, several employees of a state district court in

Jefferson Parish, Louisiana, challenged a random drug-testing policy instituted by the local clerk

of court.  <u>See</u> <u>id.</u> at *1.  The clerk insisted that drug testing was appropriate for, among other

positions, the court's criminal- and civil-minute clerks because they might have "access" to

certain evidence used during court proceedings, including drugs.  <u>See</u> <u>id.</u> at *16.  After a trial on

the merits, the federal court concluded that even though minute clerks are often in close

proximity to drugs, "at no time [are drugs] left in these employee's [*sic*] unsupervised

possession," thus rendering the "feared harm" – that the "clerks will remove the evidence from

the courtroom in plain view of all other persons present [ – ] improbable and remote."  <u>Id.</u>  The

government's invocation of special needs as to those employees, therefore, was not justified,

even if the test was permissible as to others.  <u>See</u> <u>id.</u>; <u>accord</u> <u>Jakubowicz v. Dittemore</u>, No. 05-

4135, 2006 WL 2623210, at *7 (W.D. Mo. Sept. 12, 2006) (enjoining drug testing of certain

employees working in mental-health centers in part because "[t]here [was] no evidence that the

Plaintiffs work in secure areas of the facilities . . . . no[r] evidence that these Plaintiffs have

direct responsibility for patient care").

Defendants' appeal to <u>Stigile</u> is also inapposite at this stage.  In that case, the D.C. Circuit

reversed a district court's decision, made after an expedited Rule 65(a) trial, that random drug

tests of Office of Management and Budget employees that either had offices in or permanent

access to areas "within the White House security perimeter" were not reasonable under the

Fourth Amendment.  <u>See</u> 110 F.3d at 802.  In reaching its conclusion, the D.C. Circuit held that

the government's interest – protecting the safety of the President and Vice President, who were

"frequently" on the grounds or in the same building as those employees – was "substantial."  <u>Id.</u>

at 802, 806.  Unlike here, the employees challenging the drug tests did not argue that they could

or should be segregated from areas of the White House grounds in such a way as to render drug

tests unnecessary.  <u>See id.</u> at 806-07 (noting that only "permanent passholders" were required to

undergo drug testing, unlike "non-permanent passholders" like interns, reporters, and

contractors, who had more limited access to the facilities).  In contrast, Plaintiff has argued quite

clearly that the drug-testing program was capable of being more "narrowly tailored."  Opp. at 7;

<u>see id.</u> at 9 n.3 (suggesting that "[i]t is disingenuous for defendants to assert that within the

CFL, there would not be different levels of security and areas of restricted access, e.g.,

laboratories, storage facilities, and file rooms such that Ms. Lewis, as a Human Resources

advisor would be prohibited from entering").  The government has not responded to this

assertion – likely because it cannot without citing materials outside the pleadings – and it is not

obvious to the Court that Plaintiff's intuition here is off the mark.  The Court will thus deny

Defendants' Motion to Dismiss Lewis's challenge to the drug-testing policy, at least as it was

applied to her.

Given Plaintiff's disjointed approach to pleading, however, a couple of additional loose

ends must be tied up.  First is that, in addition to her challenge to the drug-testing policy as

applied to her specifically, she also seeks injunctive relief prohibiting application of the policy to

all employees with duty stations in the consolidated laboratory, see Am. Compl., at 29, ¶ 4, or at

least to all employees "who are not in a 'high-risk, safety-sensitive job.'"  Opp. at 11.  As this

remedial request "reach[es] beyond [Plaintiff's] particular circumstances," Lewis must either be

bringing suit on behalf of others (which she is not) or she must satisfy the Supreme Court's

"standards for a facial challenge to the extent of that reach."  John Doe No. 1 v. Reed, 561 U.S.

186, 194 (2010).  To accomplish the latter, she must show "that no set of circumstances exists

under which [the Mayor's policy] would be valid" as to at least the subset of employees who are

not designated as occupying high-risk or safety-sensitive positions.  See United States v. Stevens,

559 U.S. 460, 472 (2010).  This she cannot do, in no small part because her Complaint is bereft

of any definition of the categorical distinction between "high risk" and "low risk" positions she

seeks to make.  Without an understanding of how far the relief she seeks would extend, the Court

cannot say that Plaintiff has plausibly alleged that no set of circumstances exists in which non-

high-risk or non-safety-sensitive personnel might reasonably be subject to suspicionless

searches.  See Cook v. City of Bell Gardens, No. 13-2030, 2015 WL 2342412, at *11 (C.D. Cal.

May 11, 2015) (dismissing facial constitutional challenge where "Plaintiff has not even

attempted to allege that no set of circumstances exist in which the enforcement of [a city's

building code] could be lawful").

　　The second loose end is that Lewis attacks other non-drug-test elements of the

background check as violating the Fourth Amendment, including criminal-background checks

and what she calls "medical background check[s]."  Opp. at 7; see Am. Compl. at 29, ¶ 1.  She

all but abandons her objection to the former in her Opposition, and rightfully so, as Plaintiff has

identified no privacy interest implicated by using her name to search databases of criminal

records.  See United States v. Villagrana-Flores, 467 F.3d 1269, 1277 n.4 (10th Cir. 2006)

("[T]he Fourth Amendment is not implicated simply because a name, legally obtained, is later

used to run a criminal background check.  That action is neither a search nor a seizure, for there

is no legitimate expectation of privacy in one's criminal history.").  Any such objection thus may

not proceed.

As to the medical-background check, Plaintiff objects to the policy of requiring

employees to "execute a Notification of a Drug and Alcohol Testing Form, which . . . .

require[s] . . . disclos[ure of] any current medications."  Am. Compl., ¶ 22.  This policy appears

inextricably linked to the drug-testing policy itself, and because that challenge survives, the

Court will not dismiss her related challenge to the prescription-drug-disclosure requirement at

this stage.

### 2.  *First Amendment (Count IX)*

Plaintiff's First Amendment claim is that she suffered certain harms – being forced to

endure unpleasant employment conditions and ultimately termination – that were inflicted in

retaliation for engaging in speech protected by the First Amendment.  That speech, she alleges,

consists of protesting that the city's blanket drug-testing policy was substantively

unconstitutional and that it was imposed without adequate process.  See Am. Compl., ¶ 97.

"A public employer may not discharge an employee on a basis that infringes that

employee's constitutionally protected interest in freedom of speech."  LeFande v. D.C., 613 F.3d

1155, 1158 (D.C. Cir. 2010) (citation and quotation marks omitted).  To determine whether such

a violation has come to pass, the D.C. Circuit uses a four-part inquiry:

> "First, the public employee must have spoken as a citizen on a matter
> of public concern. Second, the court must consider whether the
> governmental interest in promoting the efficiency of the public
> services it performs through its employees outweighs the

> employee's interest, as a citizen, in commenting upon matters of
> public concern. Third, the employee must show that [his] speech
> was a substantial or motivating factor in prompting the retaliatory or
> punitive act. Finally, the employee must refute the government
> employer's showing, if made, that it would have reached the same
> decision in the absence of the protected speech."

Bowie v. Maddox, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting Wilburn v. Robinson, 480

F.3d 1140, 1149 (D.C. Cir. 2007)).  "The first two inquiries are questions of law, while the last

two are questions of fact usually left to the jury."  Thompson, 428 F.3d at 286.  At the pleading

stage, however, the Complaint must still "allege[] sufficient facts for a jury to conclude" that

each factor has been satisfied, see id., giving Plaintiff the benefit of all reasonable inferences.

See Sparrow, 216 F.3d at 1113.

The first prong of the D.C. Circuit's test "really imposes two requirements – that the

employee speak 'as a citizen' and that the speech be 'on a matter of public concern.'"  Hawkins

v. D.C., 923 F. Supp. 2d 128, 137 (D.D.C. 2013).  The "matter of public concern" requirement

should be addressed first because "[i]f the speech is not on a matter of public concern, 'the

employee has no First Amendment cause of action based on his or her employer's reaction.'"

LeFande, 613 F.3d at 1159) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

The city argues that Lewis's protestations did not tackle matters of public concern,

characterizing them as mere "workplace grievance[s]" consisting of a "refusal to comply with

the Mayor's Order . . . ."  Mot. at 7.  But the D.C. Circuit has refuted "the proposition that a

personnel matter *per se* cannot be a matter of public concern."  LeFande, 613 F.3d at 1161.

Rather, speech "relates to a matter of public concern if it is 'of political, social, or other concern

to the community.'"  Id. at 1159 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  As an

example, were the head of a city department "to assert the power to fire, without process, all [its]

subordinate] officers, paid and unpaid, that action would 'be fairly considered as relating to [a

15

matter of political, social, or other concern to the community' . . . although it relates to a

'personnel matter.'" Id. at 1161.

Although she may not have been acting as a latter-day Dorothy Day, it is clear that

Plaintiff's objections to the city's drug-testing policy were not so myopic in focus as to be only

applicable to her as an individual. See Am. Compl., ¶¶ 23, 24. Lewis states that her written

correspondence with the city attorney questioned whether the policy should be applied across the

board or if it might be more narrowly tailored to exclude "positions" that were designated as

"non-sensitive." Id., ¶ 23. It is thus quite different from an employee who merely protests that,

for reasons specific to her, she should not be subject to drug testing. See Durand v. D.C., 38 F.

Supp. 3d 119, 126 (D.D.C. 2014) (police officer's emails up the chain of command constituted a

"specific personnel grievance" as he was simply "objecting to the manner in which disciplinary

proceedings against him were conducted"); Hultquist v. Hartman, No. 94-424, 1995 WL 519979,

at *3 (N.D. Ill. Aug. 30, 1995) (plaintiff's criticism of employer's drug-testing policy with

subordinate employees "during a spirited lunch break" was not made with intent to "spur

organized public interest to protest the policy" but rather "to further a purely personal interest,"

and thus was not matter of public concern). Tellingly, the city has not even attempted to argue

that a broadside attack on the constitutionality of the city's drug-testing policy is not a matter of

public import. Given the facts as alleged, Lewis's speech touched on matters of public concern.

The next question is whether she spoke "as a citizen" or, instead, "pursuant to [her]

official duties." Garcetti, 547 U.S. at 421. "[W]hen public employees make statements pursuant

to their official duties, the employees are not speaking as citizens for First Amendment purposes,

and the Constitution does not insulate their communications from employer discipline." Id.

(district attorney did not speak as private citizen when he wrote and filed memorandum that was

16

"part of what he, as a calendar deputy, was employed to do").  The Court need not dwell here, however, because Defendants have not asserted that Lewis spoke pursuant to her official duties, see Mot. at 7-8, nor is it apparent from the face of her Complaint that her job as a human-resources adviser contemplated that she advance the type of grievance she made here.  The Court will thus not dismiss her claim on that basis.

The second prong of the four-part inquiry requires the Court to consider whether the city's "interest in promoting the efficiency of the public services it performs through its employees outweighs [Lewis's] interest, as a citizen, in commenting upon matters of public concern."  Bowie, 642 F.3d at 1133.  Perhaps confused as to what "interests" are at stake in this balancing act, Defendants here offer that "the District's interest in promoting the safety and effectiveness of the [laboratory] would clearly outweigh Plaintiff's interest."  Mot. at 7.  But whatever interest the city may have in establishing a drug-test policy, that has no bearing on the First Amendment question here, which is what interest the government has "as an employer in regulating the speech of its employees," and whether that interest outweighs Plaintiff's interest as a citizen "in commenting upon matters of public concern."  Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (emphasis added).  "Here, the employer's side of the Pickering scale is entirely empty," Lane v. Franks, 134 S. Ct. 2369, 2381 (2014), and thus the Court will not dismiss Lewis's claim on this basis.

Defendants also argue that Lewis fails the third prong, which requires her to plead facts sufficient to find that the "speech was a substantial or motivating factor in prompting the retaliatory or punitive act."  Bowie, 642 F.3d at 1133.  They argue that there is too great an interval between her speech, which allegedly took place in July of 2012, see Am. Compl., ¶¶ 23-24, and her termination, which occurred in April 2013.  See id., ¶ 20; Mot. at 8.  Even if they are

right, they calculated the time elapsed based only on Plaintiff's date of <u>termination</u>.  Their

Motion thus completely ignores her allegations that the retaliation comprised "a campaign" of

actions including but not limited to her firing.  <u>See id.</u>, ¶ 24.  Some of those steps took place at

least as early as October 2012, when Plaintiff alleges she was forced to remain in her office alone

and without heat.  <u>See id.</u>, ¶ 24.  Others, like the posting of her photograph at the guard booth,

may have taken place earlier than that.  Having not disputed that these other incidents may <u>also</u>

constitute "adverse actions" in the First Amendment context, <u>see</u> <u>Tao v. Freeh</u>, 27 F.3d 635, 639

(D.C. Cir. 1994), Defendants are wrong to assert that the Complaint fails to plausibly allege

causation between her speech and the city's retaliatory conduct.

Finally, Defendants make no argument on the fourth prong, which is not, in any case,

appropriately decided on a motion to dismiss.   The Court will thus not dismiss Plaintiff's First

Amendment claim at this stage.

### 3.   *Fourteenth and Fifth Amendments (Also Count II)*

Plaintiff also alleges (in the same count as her Fourth Amendment claim) that Defendants

denied her "Right of Due Process" guaranteed by the Fourteenth Amendment.  <u>See</u> Am. Compl.,

¶ 49; <u>see also</u> <u>id.</u>, ¶¶ 4, 28, 65, 68, 71.  As a preliminary matter, Defendants correctly point out

that she invoked the wrong constitutional amendment, since it is the Fifth Amendment, and not

the Fourteenth, that applies to the District of Columbia and its employees.  <u>See</u> <u>Butera v. D.C.</u>,

235 F.3d 637, 646 n.7 (D.C. Cir. 2001) (citing <u>Bolling v. Sharpe</u>, 347 U.S. 497, 499 (1954)).  For

that reason alone, the District asks that all due-process claims be dismissed.  <u>See</u> Mot. at 13.

While the Court is not predisposed to leniency as Plaintiff's Complaint leaves much to be

desired, Defendants were given "fair notice" that she intended to invoke those due-process

protections that <u>were</u> applicable to the District – *viz.*, in the Fifth Amendment – which is "all that

is required in this instance to withstand a motion to dismiss." Jones v. D.C., 273 F. Supp. 2d 61, 65 (D.D.C. 2003).

Even giving Plaintiff the benefit of the doubt on that front, however, she never provides fair notice of what she means when she invokes "due process" in her Complaint. And, as a consequence, she offers no plausible basis for stating a Fifth Amendment claim. As far as the Court can tell, Plaintiff appears to allege only varieties of procedural due-process violations. Given the prolixity of Plaintiff's Complaint, it is, of course, possible that, buried deep therein, she dropped clues that, if properly assembled, would allege a deprivation of substantive due process. Yet "'[o]nly the most egregious official conduct' rises to the level of a substantive due process violation." Yates v. D.C., 324 F.3d 724, 725 (D.C. Cir. 2003) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)). The facts alleged here come nowhere close to meeting this high standard.

Returning to procedural due process, the Complaint similarly fails to state a claim that can survive a motion to dismiss. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). To the extent that a constitutionally protected "liberty" or "property" interest is placed at risk of deprivation, the government must provide "such procedural protections as the particular situation demands." Id. at 334 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

Plaintiff's Complaint does not satisfy the key components of this standard. In many paragraphs, she alleges the inadequacy of certain procedural protections but without ever identifying any deprivation of a recognized liberty or property interest. See Am. Compl., ¶ 23

(suggesting the "ultimatum" she was given by the city attorney to consent to the drug test or risk termination violated her "due process right to fair notice"); <u>id.</u>, ¶ 28 (same), <u>id.</u>, ¶ 41 (arguing that "<u>threaten[ing]</u> to take away [her] paramount property interest in her civil servant job is per se a violation of due process") (emphasis added); <u>id.</u>, ¶ 65 (same).  Lewis offers no legal basis for concluding that she has a constitutionally protected interest in being free from a <u>threatened</u> termination, and, indeed, the Court knows of no such case to so hold.

In other paragraphs, Plaintiff identifies at least <u>some</u> plausible constitutionally protected interests that were infringed upon – <i>e.g.</i>, her public employment and her reputation.  <u>See</u> Am. Compl., ¶ 95 (alleging that "Defendants' actions and conduct have caused . . . loss of reputation"); <u>see also</u> <u>id.</u>, ¶¶ 71-73.  But even if these interests are constitutionally protected, Plaintiff offers absolutely no detail as to what procedures she was owed to avoid such harms. <u>See, e.g.</u>, <u>id.</u>, ¶ 43 (alleging that she was terminated "without . . . any proper and reasonable procedure").  "Because it is devoid of allegations as to the actual process purportedly denied [Plaintiff], the Amended Complaint does not raise [her] procedural due process claim 'above the speculative level' to the realm of plausibility."  <u>McManus v. D.C.</u>, 530 F. Supp. 2d 46, 73 (D.D.C. 2007) (quoting <u>Bell Atl. Corp.</u>, 550 U.S. at 555).  Her due-process claims will thus be dismissed.

4.  *"Wrongful Termination and Retaliation in Violation of 42 U.S.C. § 1983" (Count V)*

The Court will also dismiss Count V, entitled "Wrongful Termination and Retaliation in Violation of 42 U.S.C. § 1983," which does not state a claim distinct from the three constitutional ones discussed above.  Having done the work to align Plaintiff's pleadings into cogent constitutional claims, the Court concludes that all of the allegations contained within Count V are purely repetitive of the others.  As a reminder: § 1983 <u>already</u> serves as the statutory

basis for Plaintiff's constitutional claims, and it "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)). This count cannot proceed.

B. Federal and State Statutory Claims

Plaintiff also alleges that Defendants violated various and sundry federal and state statutes that prohibit discrimination or retaliation in some form or another. All but one of these statutory claims fail.

1. *Title VII Discrimination (Count III)*

The Complaint first asserts without any factual basis that the city discriminated against Plaintiff on the basis of her race in violation of Title VII of the Civil Rights Act of 1964. See Am. Compl., ¶ 55. She appears, however, to have abandoned this claim in her Opposition, see Opp. at 17, and the Court will thus grant Defendants' Motion to Dismiss this count. See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); accord Ass'n of Am. Physicians & Surgeons v. Sebelius, 746 F.3d 468, 471 (D.C. Cir. 2014) (affirming district court's decision to "infer[] concession from gaps in a plaintiff's opposition to a motion to dismiss").

2. *Americans with Disabilities Act (Count VIII)*

Continuing her pattern of advancing numerous causes of action in a single count, Plaintiff next alleges several distinct ADA violations against Defendants in Count VIII. The first claims that the city made an improper medical inquiry, which is prohibited under the ADA except under

certain circumstances.  The second asserts that the District discriminated against her on the basis

of her disability.  Finally, in her Opposition, she seeks to add a third ground for relief –

retaliation.  All but the first proceed no farther.

### i. Improper Medical Inquiry

Plaintiff's primary allegation is that the ADA prohibited the District from requiring her to

both submit to a drug test and to fill out the "Notification of [] Drug and Alcohol Testing Form,"

which allegedly demanded that Plaintiff disclose "any current medications."  Am. Compl., ¶¶ 21,

22.  Such demands, she claims, are barred under the ADA.

In addition to prohibiting discrimination and retaliation on the basis of an employee's

disability, see, e.g., 42 U.S.C. §§ 12112, 12203, the ADA also places restrictions on an

employer's ability to make medically related inquiries of its employees, whether they suffer from

a disability or not.  Section 12112(d)(4)(A) provides that a covered employer

> shall not require a medical examination and shall not make inquiries
> of an employee as to whether such employee is an individual with a
> disability . . . unless such examination or inquiry is shown to be job-
> related and consistent with business necessity.

Despite the apparent breadth of that provision, the statute elsewhere clarifies that "a test to

determine the illegal use of drugs shall not be considered a medical examination," id. §

12114(d)(1), although it includes a disclaimer that "[n]othing in this subchapter shall be

construed to encourage, prohibit, or authorize the conducting of drug testing for the illegal use of

drugs by job applicants or employees or making employment decisions based on such test

results."  Id. § 12114(d)(2); see also 29 C.F.R. § 1630.16(c).

In responding to Plaintiff's allegations, Defendants argue primarily that "a drug test is not

a medical examination" under § 12114(d)(1), and that Plaintiff's ADA claim thus fails as a

matter of law.  See Mot. at 22.  Defendants may be right on that first narrow point.  But see

E.E.O.C. v. Grane Healthcare Co., No. 10-250, 2015 WL 5439052, at *39 (W.D. Pa. Sept. 15, 2015) (explaining that, under certain conditions, a drug test may be an improper "medical examination" under § 12112(d)(4)).  But they conveniently ignore Plaintiff's other allegation – that the District impermissibly required her to disclose her prescription-drug regimen.  Without developed argumentation from the District on this point, and considering that other courts have found factually similar inquiries to be prohibited by the ADA, the Court concludes that this allegation is sufficient to allow her claim to proceed at this stage.  See, e.g., Bates v. Dura Auto. Sys., Inc., 767 F.3d 566, 578 (6th Cir. 2014) ("'Obviously, asking an employee whether he is taking prescription drugs or medication, or questions seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the past [,] trigger the ADA's . . . protections.'") (quoting Lee v. City of Columbus, 636 F.3d 245, 254 (6th Cir. 2011); Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1226 (10th Cir. 1997) (same); accord EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), Part B.1 (July 27, 2000) ("Disability-related inquiries may include . . . asking an employee whether s/he currently is taking any prescription drugs or medications . . . .") available at: http://www.eeoc.gov/policy/docs/guidance-inquiries.html.

Defendants also argue that all Plaintiff's ADA claims fail because she has not pled a covered disability.  While the Court agrees that "difficulty of traversing stairs" almost certainly does not qualify as a disability under the ADA, see Am. Compl., ¶ 24, the medical-inquiry provisions of the statute "protect[] all employees from medical inquiries, regardless of whether they have a qualifying disability."  Bates, 767 F.3d at 573.  Lewis's improper-inquiry claim under Count VIII thus survives.

*ii.* Disability Discrimination

Like her race-discrimination count, Plaintiff has vaguely pleaded but subsequently abandoned a claim that she was discriminated against on the basis of a disability.  Compare Am. Compl., ¶ 85-86 with Opp. at 17.  To the extent Count VIII contains a cause of action for disability discrimination, it will not proceed.

*iii.* Retaliation

In her Opposition, Plaintiff also attempts to plead that she was retaliated against for protesting the drug test.  See Opp. at 17.  But because that claim is newly presented, the Court will not address it here.  See, e.g., Kingman Park Civic Ass'n v. Gray, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014) ("It is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss.").  Nor will the Court treat her request for "leave to amend" her Complaint as a properly filed motion under Rule 15(a).  See Opp. at 17; Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 130 (D.C. Cir. 2012) ("[A] bare request in an opposition to a motion to dismiss – without any indication of the particular grounds on which amendment is sought – does not constitute a motion within the contemplation of Rule 15(a).") (citation and quotation marks omitted).

3. *Genetic Information Nondiscrimination Act (Count VII)*

Next up is Plaintiff's novel gambit of alleging discrimination under the Genetic Information Nondiscrimination Act (GINA) of 2008, see 42 U.S.C. § 2000ff *et seq.*, which prohibits discrimination on the basis of an employee's "genetic information."  See id. § 2000ff-1(a).  In some ways similar to the ADA, GINA prohibits an employer from "request[ing], requir[ing], or purchas[ing] genetic information with respect to an employee," id. § 2000ff-1(b) (emphasis added), subject to certain exceptions not applicable here.  Lewis alleges that the mandatory drug test constituted such an improper request.  See Am. Compl., ¶ 78-80.  As

Defendants point out, however, nothing in the Complaint suggests that, through its drug-test policy, the District requested <u>genetic information</u> as that phrase is defined by statute.  <u>See</u> § 2000ff(4) ("The term 'genetic information' means, with respect to any individual, information about--(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual."); 29 C.F.R. § 1635.3(c).  EEOC implementing regulations make clear, furthermore, that "[a] test for the presence of alcohol or illegal drugs is not a genetic test," 29 C.F.R. § 1635.3(f)(4)(i), meaning that a <u>request</u> for such a test similarly does not constitute a request for genetic information under EEOC rules.  This brave-new-world count ends here.

### 4.  *D.C. Human Rights Act (Count IV)*

Plaintiff's final statutory claim is that the District retaliated against her in violation of the D.C. Human Rights Act.  Although the Complaint clearly identifies what Plaintiff believes constitutes the retaliation – her exile in the abandoned building and her eventual termination, <u>see</u> Am. Compl., ¶ 69 – she never alleges that she took any action covered by the statute that prompted her employer to react improperly.  For that reason, her claim will not continue beyond the pleading stage.

The DCHRA proscribes discriminatory employment practices based on an employee's "race, color, religion, . . . disability . . . or political affiliation," among other things, D.C.Code § 2–1402.11(a)(1), and also prohibits retaliating against an employee "on account of having exercised or enjoyed . . . any right granted or protected under this chapter."  <u>Id.</u> § 2–1402.61(a); <u>see</u> <u>McCaskill v. Gallaudet Univ.</u>, 36 F. Supp. 3d 145, 154 (D.D.C. 2014).  A DCHRA retaliation claim effectively mirrors such a claim "under the federal employment discrimination laws." <u>McCain v. CCA of Tenn., Inc.</u>, 254 F. Supp. 2d 115, 124 (D.D.C. 2003).  Thus, "to prove

unlawful retaliation, a plaintiff must show that: (1) she engaged in [a statutorily protected activity]; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights."  McCaskill, 36 F. Supp. 3d at 154 (citation and quotation marks omitted).

In Lewis's case, she has not plausibly alleged that she participated in any "statutorily protected activity."  Id.  She alleges only that she "rightfully objected" to the District's drug-testing policy and consent form, see Am. Compl., ¶ 65, but nowhere in her Opposition does she explain how such actions constitute protected activity under the DCHRA.  To be sure, the statute's language offers little guidance in determining what types of activities fall within the ambit of "protected activity."  See McCaskill, 36 F. Supp. 3d at 154.  But courts interpreting this provision of the DCHRA have emphasized that the law serves primarily to "protect[] employees who bring or threaten to bring a discrimination claim against their employer."  Id. (emphasis added); see also Vogel v. D.C. Office of Planning, 944 A.2d 456, 464 (D.C. 2008) ("To constitute 'protected activity,' [an employee's complaint to the D.C. Office of Human Rights] must allege an employment practice that is prohibited by the DCHRA.").  Plaintiff nowhere alleges that the communications with the city's lawyer about her objection to a generally applicable city policy constituted a complaint of discrimination in any manner of speaking, and the Court sees no other basis on which Lewis may properly establish a claim of retaliation under the DCHRA.

C.  Common-Law Claims

Plaintiff's last set of counts involves common-law claims for wrongful termination (Count I), intentional infliction of emotional distress (Count VI), and defamation (Count X).  The Court need not address the merits of any of these, as it is clear that Plaintiff should have first

sought administrative redress under the District's Comprehensive Merit Personnel Act (CMPA) before lodging such claims in court.

"The CMPA provides a remedy for the majority of employment related conflicts that occur between the District of Columbia and its employees." Owens v. D.C., 923 F. Supp. 2d 241, 248 (D.D.C. 2013); see D.C. Code § 1-601.02. The D.C. Court of Appeals views the CMPA's breadth expansively and has construed its provisions as creating "a comprehensive system of administrative review of employer actions" that "address[es] virtually every conceivable personnel issue among the District, its employees, and their unions – with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum." D.C. v. Thompson, 593 A.2d 621, 633, 634 (D.C. 1991) (emphasis added).

Its provisions cover all manner of employee complaints arising out of "performance ratings," "discipline," and other grievances. Stockard v. Moss, 706 A.2d 561, 564 (D.C. 1997); see also D.C. Code § 1-603.01(10) (defining "grievance" as "any matter under the control of the District government which impairs or adversely affects the interest, concern, or welfare of employees," excluding removals, suspensions, and other pay or classification-related changes). Thus, if an employee "claims wrongful treatment and injury [that is] cognizable as a 'personnel issue' under the Act's 'performance ratings,' 'adverse actions,' and employee 'grievances' provisions," a common-law claim arising out of those circumstances will be preempted by the Act. King v. Kidd, 640 A.2d 656, 663 (D.C. 1993) (emphasis added) (quoting D.C. Code §§ 1-615.1 to -615.5 and §§ 1-617.1 to -617.3); see Washington v. D.C., 538 F. Supp. 2d 269, 279 (D.D.C. 2008) ("When tort claims are predicated upon conduct that may be a proper subject of a grievance under the CMPA, the [Act's] exclusivity principles . . . will preclude litigation

of . . . [claims such as] emotional distress and defamation prior to exhaustion of administrative remedies.")  (citation and quotation marks omitted).

While its provisions are not so expansive as to cover every harmful act occurring in the workplace, see, e.g., King, 640 A.2d at 664 (concluding that "discrimination complaints" falling "within the jurisdiction of the D.C. Office of Human Rights" were expressly excluded by regulation from the remedial provisions of the CMPA); Stockard, 706 A.2d at 565 n.9 (noting the District's concession that assault and battery are not covered by the CMPA), courts have found its provisions to preclude the types of common-law claims filed against Defendants here.  See, e.g., Stockard, 706 A.2d at 563 (defamation and intentional infliction of emotional distress); Lewis v. D.C. Dep't of Motor Vehicles, 987 A.2d 1134, 1138 (D.C. 2010) (wrongful termination in violation of public policy); Saint-Jean v. District of Columbia, 846 F. Supp. 2d 247, 264-65 (D.D.C. 2012) (defamation); Payne v. District of Columbia, 592 F. Supp. 2d 29, 38 (D.D.C. 2008) (defamation); but see King, 640 A.2d at 664 (concluding that intentional-infliction-of-emotional-distress and retaliation claims "premised on" employee's sexual-harassment complaint not preempted by CMPA).

All of Plaintiff's common-law causes of action fall within the general category of personnel matters redressable under CMPA processes.  Her claim that she was wrongfully terminated, for instance, is precisely the type of complaint that the CMPA was designed to handle.  See Lewis, 987 A.2d at 1137 (DMV hearing examiner who was fired for refusing to enforce what he believed was an unconstitutional statute was required to exhaust CMPA remedies before filing wrongful-termination action in court).

Her defamation claim is also properly categorized as a "personnel issue" under the CMPA, as it "arise[s] out of an employment-related dispute."  Alexis v. D.C., 44 F. Supp. 2d

331, 349 (D.D.C. 1999).  The link between Plaintiff's refusal to undertake the drug test and the inaccurately captioned photograph posted at the laboratory's guard station is unmistakable. Lewis admittedly refused to take the drug test, and, despite being an employee of OCME, she was not permitted to enter the laboratory under the city's new policy.  Whether categorized as a grievance or an adverse action under the CMPA, the statute's administrative procedures afforded her a clear avenue for seeking relief, which she must pursue before seeking judicial review.  See Thompson, 593 A.2d at 635; cf. Hoey v. D.C., 540 F. Supp. 2d 218, 230 (D.D.C. 2008) (noting that even defamatory statements made after employee was fired are covered by CMPA).

Her intentional-infliction-of-emotional-distress claim follows suit.  The primary injury she alleges is the enforcement of what Lewis asserts is an unconstitutional employment policy. The Court is unsure how such policy could even plausibly satisfy the substantive standard for an emotional-distress claim, see Abourezk v. New York Airlines, Inc., 895 F.2d 1456, 1458 (D.C. Cir. 1990) (plaintiff must prove, among other things, "extreme and outrageous" conduct by defendants), and, in any event, the actions Lewis complains of are, at bottom, a personnel issue that is redressable under the CMPA.

To the extent Plaintiff premises her cause of action on the purportedly retaliatory behavior of Beverly Fields – i.e., by directing individuals to "stealthily and surreptitiously enter" Lewis's office space, see Am. Compl., ¶ 58 – she has offered no explanation as to why such actions fall within the "narrow exception[s] to the exclusivity provision of the CMPA." Robinson v. D.C., 748 A.2d 409, 411 (D.C. 2000).  Even if they did, such conduct does not plausibly satisfy the "demanding standard" of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Heasley v. D.C. Gen. Hosp., 180 F. Supp. 2d 158, 173

(D.D.C. 2002) (quoting <u>Bernstein v. Fernandez</u>, 649 A.2d 1064, 1075 (D.C. 1991)).  Plaintiff's intentional-infliction-of-emotional-distress claim, like her other two common-law claims, will therefore be dismissed.

  D. <u>Dismissal of Individual Plaintiffs</u>

   In addition to suing the District, Lewis has also named an array of individual Defendants, including Gray, Tucker, Fields, and Paul Quander, the city's director of public safety, along with "Does 1 through 50."  <u>See</u> Am. Compl. at 1.  In this Motion, Gray and Fields seek dismissal of all surviving claims against them, whether in their official or individual capacities.  Now that the Court has dismissed much of the Complaint, the only surviving count lodged against these two individual Defendants is Count II, which is Plaintiff's § 1983 claim for a violation of her rights under the Fourth Amendment.  <u>See</u> Section III.A.1, *infra*.  The Court separately considers it as an official-capacity and personal-capacity claim.

   1. *Official-Capacity Claim*

   While "personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985), "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  <u>Id.</u> (quoting <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690 n.55 (1978)).  The D.C. Circuit has thus concluded that "[a] section 1983 suit for damages against municipal officials in their official capacities is . . . equivalent to a suit against the municipality itself."  <u>Atchinson v. D.C.</u>, 73 F.3d 418, 424 (D.C. Cir. 1996).  Because Plaintiff's § 1983 claim under the Fourth Amendment will proceed against

the District, the Court will dismiss it as redundant against Gray and Fields in their official

capacities.  See Cooke-Seals v. District of Columbia, 973 F.Supp. 184, 187 (D.D.C. 1997).

> 2.  *Personal-Capacity Claim*

"To state a claim under § 1983 against an official in his <u>individual</u> capacity, a plaintiff

must plead facts sufficient to allege (1) 'the violation of a right secured by the Constitution and

the laws of the United States,' and (2) 'that the alleged deprivation was committed by a person

acting under color of state law.'"  Ford v. Donovan, 891 F. Supp. 2d 60, 65 (D.D.C. 2012)

(quoting West v. Atkins, 487 U.S. 42, 48 (1988)) (emphasis added).

As to Fields: The Complaint pleads no facts that any Fourth Amendment deprivation was

committed by her.  The only specific conduct attributed to her pertains to her alleged

involvement in directing a subordinate to surprise Plaintiff in the abandoned office building – a

series of incidents that has no bearing on Lewis's Fourth Amendment claim.  Fields will thus be

dismissed from the case.

As to Gray: While a plaintiff may bring suit against a mayor in his individual capacity

under § 1983, she may do so only by alleging "that the Mayor was directly responsible for the

constitutional deprivation" or that he gave "'authorization or approval of such misconduct.'"

Ekwem v. Fenty, 666 F. Supp. 2d 71, 76 (D.D.C. 2009) (quoting Int'l Action Center v. United

States, 365 F.3d 20, 27 (D.C. Cir. 2004), quoting, in turn, Rizzo v. Goode, 423 U.S. 362, 371

(1976)).  A key flaw in Plaintiff's claim against Gray is that, while the Mayor's Order clearly

provides the basis for the District's implementation of a drug-testing policy, neither the Order

nor the facts alleged in the Complaint indicate that the Mayor himself had any role in the

decision to fire employees who refused to comply with that policy.  The Order merely delegates

authority to the District's Department of Human Resources to use a variety of means – including

"one or more of the following: background checks, investigations, mandatory criminal background checks, and testing for controlled substance use" – as a way of "provid[ing] for the security and protection of evidence and samples in [the Department of Forensic Sciences'] custody." Mayor's Order 2012-84 at 1. It does not <u>require</u> the Human Resources department to use drug testing as the chosen means for providing such security, nor does it even state that any such means must necessarily apply to the entire laboratory workforce. Without allegations in her Complaint to suggest that Gray had any personal role in her ouster, the suit against him cannot proceed.

## IV.   Conclusion

For these reasons, the Court will grant Defendants' Motion to Dismiss as to Counts I, III-VII, and X-XI, and as to Defendants Gray and Fields. It will deny Defendants' Motion as to Counts II, VIII, and IX. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:   December 7, 2015