PATRICIA D. LEWIS,

    Plaintiff,

       v.

GOVERNMENT OF THE DISTRICT OF
COLUMBIA, *et al.*,

    Defendants.

Civil Action No.  15-521 (JEB)

## MEMORANDUM OPINION

    In response to an Order from then-Mayor Vincent Gray, the D.C. Department of Human Resources determined that all Office of Chief Medical Examiner employees would be subject to random drug and alcohol testing upon relocation to the new Consolidated Forensic Laboratory building.  Plaintiff Patricia Lewis, a former OCME employee, objected and was ultimately terminated in April 2013.  She responded with this suit alleging a host of constitutional and common-law claims against the District and several individual officials.  Deciding earlier Motions to Dismiss, the Court narrowed both the claims and the number of Defendants. Following discovery, both sides have now filed Cross-Motions for Summary Judgment on the remaining counts.  As genuine issues of material facts loom on some, the Court will deny the Motions in part, but enter judgment for Defendants on two causes of action.

## I.    Background

    Because both sides have filed Cross-Motions, the facts cannot be set forth in the light most favorable to the non-moving party.  As a result, the Court recounts the undisputed facts, while noting specific disagreements about others.

A.  Factual History

For the better part of a decade, Lewis worked as a "[Human Resources] Advisor, Management Liaison Specialist" in D.C.'s Office of Chief Medical Examiner.  See ECF No. 7 (Am. Compl.), ¶ 20.  OCME's duties include autopsies as well as other forensic and medico-legal investigations.  See generally D.C. Code § 5-1401 et seq.  From the time she was hired until October 2012, OCME was located in an office building on Massachusetts Avenue in Southeast Washington.  See Am. Compl., ¶ 24.

At some point, the city undertook a plan to design and construct the Consolidated Forensic Laboratory.  This new laboratory would house under one roof a number of city departments, including OCME, the Department of Forensic Sciences, and several divisions of the Metropolitan Police Department, such as the Firearms and Fingerprint Examination Division, the DNA laboratory, and the Forensic Sciences Services Division.  See D.C. Council Resolution No. 19-726 § 2(b) (Dec. 4, 2012).  On June 18, 2012, Mayor Gray signed Order 2012-84, providing authority for the Director of the D.C. Department of Human Resources to "identify[] and designat[e] high-risk or sensitive positions" for employees who would have a duty station at the CFL.  See Def. MSJ, Exh. C (Mayor's Order) at 1.  Employees so designated would be subject to "background checks, investigations, mandatory criminal background checks, and[/or] testing for controlled substance use."  Id.

On July 18, 2012, Charles Tucker, DCHR General Counsel, and other members of his department held a meeting at OCME and distributed letters informing the staff that the office would be moving to the CFL.  Pursuant to the Mayor's Order, the letter advised that, "due to the nature of work performed in the CFL, employees occupying positions which have duty stations" there would be "subject to mandatory criminal background checks and testing for controlled

substance use." Def. MSJ, Exh. E (Letter from DCHR Director Shawn Stokes to Lewis). The letter indicated that recipients could contact Plaintiff, the agency's HR Advisor, for additional information, and it directed policy-related questions to DCHR's Legal and Compliance Administration. Id.

At the meeting, DCHR also distributed several forms, including an "Individual Notification of Requirements Form for Drug and Alcohol Testing." Def MSJ, Exh. G at 1 (Notice and Acknowledgment Form). Citing the Mayor's Order, it stated:

> [T]his notice informs you that you have been appointed to, or you currently occupy, either as an employee or volunteer, a covered position that makes you subject to drug and alcohol testing while assigned. Covered positions include protection-sensitive positions that affect the health, safety and welfare of the general public. . . . As an appointee, employee, or unsupervised volunteer in a covered position at a District government agency, you are hereby informed that this District agency is subject to drug and alcohol testing. Thirty (30) days after you acknowledge receipt of this advance written notice, you will be subject to drug and alcohol testing, unless you acknowledge a drug or alcohol problem during the 30-day notification period.

Id. The bottom portion of the notice, titled "Acknowledgement of Receipt," required the employee's signature, which would be an admission that she "currently occup[ied] a protection-sensitive position that is subject to drug and alcohol testing." Id. Plaintiff voiced her objections to the policy at the meeting and refused to sign the form. See Def. Statement of Facts, ¶ 33. So concludes the facts from that day upon which the parties agree.

Plaintiff's version of the meeting is as follows. According to her, Tucker "rude[ly]" descended upon the OCME staff, informing them of the move to the CFL and the resulting requirement "to undergo a background check and drug testing." Pl. SOF, ¶ 12. He told them that they had until 4:00 p.m. to sign and return the forms or they would be fired. Id., ¶ 14. Several employees, including Lewis, were taken aback by the request. Id., ¶¶ 39-42. Lewis

"raised her hand and asked questions in a way that was neither belligerent nor impolite." Id., ¶ 29. She questioned why she would need to undergo such testing when her job responsibilities would not change once she moved to the CFL. See Pl. Reply, Attach. 2 (Declaration of Patricia Lewis), ¶ 14.

Defendants dispute nearly all of Lewis's account. According to them, Tucker held the meeting to inform OCME staff about the move to the CFL and the accompanying drug-and-alcohol-testing requirements. He did not give an ultimatum or tell anyone that they would have to undergo drug and alcohol testing, but merely informed them that they would be subject to substance testing "as a condition of relocating to the CFL." Def. SOF, ¶ 12. Tucker denies that he was anything other than the "messenger," sent to "carry out a mayor's directive." Pl. MSJ, Exh. 1 (Deposition of Charles Tucker) at 46:22. Defendants aver that employees were asked to sign the acknowledgment form without any time pressure, at which point Lewis "belligerent[ly]" and "disrespectful[ly]" voiced her objection to the Mayor's Order. See Def. SOF, ¶ 29.

Two days after the meeting, Plaintiff sent a grievance letter to Tucker protesting the policy and claiming that he was "violating [her] rights to be made aware of any change in working conditions and conditions of employment." Def. MSJ, Exh. H (July 20 Letter from Lewis to Tucker) at 1. Lewis stated that she "was hired into a non-sensitive position that has not been re-classified nor designated as high risk" and would not sign the acknowledgment form until DCHR conducted a "reclassification and risk assessment." Id. She further alleged that her direct supervisor, Beverly Fields, retaliated against her for speaking up at the meeting. Id. at 2. Plaintiff acknowledged that she had "asked a lot of questions in the meeting," but attributed her inquisitiveness to surprise. Id. at 2. "As the agency's HR Advisor," Lewis noted that she "might have taken a different approach if [she] had prior knowledge or involvement in this process." Id.

She lamented that "no one at this agency nor the DC DCHR ha[d] involved [her] in any way about this relocation and the requirements that would be imposed," despite the fact that her "name was included in every employee's letter as being the point of contact." Id. Plaintiff maintained that she "had every right to protect [her] own best interests" and that the Agency as a whole was "caught totally off guard by this process." Id. On August 30, 2012, Tucker denied the grievance as unauthorized by the District Personnel Manual. See Def. MSJ, Exh. I.

In October 2012, DCHR Director Shawn Stokes sent Lewis two follow-up notices, requesting that she sign and return the notice-and-acknowledgment forms, but Plaintiff refused to do so. See Def. Exhs. J-K. The notices further advised that "corrective and/or adverse action" could result if she did not "comply with this process" by November 8, 2012. In late October, OCME moved to the CFL. See Def. MSJ, Exh. J (Notification of Relocation to CFL). On October 23, Lewis attempted to move some of her files into the CFL but was escorted out of the building. See Def. SOF, ¶ 69. She alleges that she had supervisor approval to move, but Defendants maintain that she was not cleared to enter the building because she had still not signed the acknowledgment forms. See Pl. SOF, ¶¶ 69, 84; Def. MSJ, Exh. K (October 23, 2012, Letter from Stokes to Lewis). While the rest of the OCME staff moved to the CFL, Lewis thus remained alone at the Massachusetts Avenue building. The parties disagree as to her working conditions there but, suffice it to say, they were not ideal. The building was old and had issues with the heat, elevators, and phones. See Def. SOF, ¶¶ 44, 46-47. Plaintiff nonetheless continued to work there until she received an Advance Written Notice of Proposed Removal on January 3, 2013, when she was placed on administrative leave. See Def. MSJ, Exh. L; Def. SOF, ¶ 83. The letter charged her with "neglect of duty and insubordination" on three occasions: (1) refusing to sign the notice-and-acknowledgment forms on July 18; (2) refusing to sign the

forms after the October follow-up letters; and (3) attempting to move into the CFL without being cleared. Id. at 1-2. On April 9, 2013, the District officially terminated Lewis based on the charges in the January 3 letter. See Def. MSJ, Exh. M (Notice of Final Decision on Proposed Removal).

    B. Procedural History

    Nearly two years after her termination, Lewis filed this suit against the District, former Mayor Gray, Tucker, Beverly Fields (OCME Chief of Staff and Lewis's supervisor), Paul Quander (former Deputy Mayor for Public Safety), and an unspecified group of John Does. See Am. Compl. at 1. The Complaint alleged a bevy of claims, some against only the District, some against only individuals, and some against all. On August 10, 2015, the District, Gray, and Fields filed a Motion to Dismiss, which the Court granted in part. See ECF Nos. 30-31. Specifically, the Court dismissed Counts I (wrongful termination), III-VII (alleging Intentional Infliction of Emotional Distress and violations of Title VII, the D.C. Human Rights Act, § 1983, and the Genetic Information Nondiscrimination Act), X (defamation), and XI (Declaratory and Injunctive Relief). The Court also dismissed Lewis's ADA claim except to the extent that she alleged the District had made an improper inquiry into her medical history. The Court further dismissed Gray and Fields as Defendants, finding that any claim against them in their official capacities was redundant given Plaintiff's naming of the District, and any individual-capacity claim did not sufficiently assert their personal involvement. Defendants Tucker and Quander separately filed Motions to Dismiss, and the Court denied the former but granted the latter in a separate Opinion. See ECF No. 34. The prior Opinions, therefore, left standing the District and Tucker as the sole remaining Defendants and the following claims: violations of the Fourth Amendment (Count II), ADA by making an improper medical inquiry (Count VIII), First Amendment (Count IX), as well as claims for defamation (Count X) and IIED (Count VI).

Having conducted discovery for over a year, the parties now submit Cross-Motions for Summary Judgment. Plaintiff does not appear to have conjured up any use for the Doe Defendants, and she also voluntarily dismisses her defamation claim. See Pl. MSJ at 39. The parties' dueling Motions, therefore, address the remaining causes of action.

## II.    Legal Standard

"When faced with cross-motions for summary judgment, th[e C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Family Trust of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)). Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Airlie Foundation v. IRS, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citing Rhoads v. McFerran, 517 F.2d 66, 67 (2d Cir. 1975)); see also Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); CEI Wash. Bureau, Inc. v. DOJ, 469 F.3d 126, 129 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

To defeat summary judgment, however, the Opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

## III. Analysis

As a reminder to the readers keeping score, the remaining counts against the District are: 1) First Amendment violation; 2) Fourth Amendment violation; and 3) ADA violation. Against Tucker, Plaintiff presses claims under the Fourth Amendment and for intentional infliction of emotional distress. The Court addresses each below.

### A. First Amendment (Count IX)

Lewis asserts that the District illegally fired her in retaliation for exercising her free-speech rights. See Am. Compl., ¶ 97. Specifically, she argues that her protest at the July 18

meeting and her July 20 letter to Tucker were protected speech. The undisputed facts show otherwise.

Government employees "do not surrender all their First Amendment rights by reason of their employment"; rather, the "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Accordingly, "[a] public employer may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." LeFande v. District of Columbia, 613 F.3d 1155, 1158 (D.C. Cir. 2010) (citation and quotation marks omitted). To prevail on a First Amendment retaliation claim in this Circuit, a public employee must satisfy a four-pronged test:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that [his] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

Bowie v. Maddox, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting Wilburn v. Robinson, 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two factors are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." Wilburn, 480 F.3d at 1149 (citation and ellipsis omitted). As Defendants prevail on the first two, the Court need proceed no further.

### 1. *Citizen Speech on Matter of Public Concern*

The first prong really asks two questions: whether the employee spoke "as a citizen" and whether that speech was "on a matter of public concern." Hawkins v. District of Columbia, 923

F. Supp. 2d 128, 137 (D.D.C. 2013) (citation omitted). The question of whether the District coerced the entire OCME staff to submit to an unconstitutional search in order to keep their jobs is certainly a matter of public concern. See LeFande, 613 F.3d at 1161 (holding that Metropolitan Police Department Reserve Corps member's claim against new MPD policy was matter of public concern because his "allegations of procedural irregularities that unquestionably affect an integral component of police service are relevant to the public's evaluation of the MPD and its Chief"); Tao v. Freeh, 27 F.3d 635, 640 (D.C. Cir. 1994) (allegation of racial discrimination within agency is matter of public concern); Hill v. Bd. of Trs. of the Univ. of D.C., 146 F. Supp. 3d 178, 189 (D.D.C. 2015) (employee's complaints that university was unlawfully compromising student privacy rights was matter of public concern because it "is the type of conduct that the tax-paying community would want to know"); Hultquist v. Hartman, No. 94-424, 1994 WL 383952, at *8 (N.D. Ill. July 20, 1994) (statements criticizing park drug-and-alcohol-testing policy matter of public concern).

To succeed on this prong, however, Plaintiff must also show that she was speaking "as a citizen," as opposed to an employee, which is a fact-intensive inquiry. Garcetti, 547 U.S. at 418. Employees do not speak "as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline," when they "make statements pursuant to their official duties." Id. at 421. Because it was undisputed in Garcetti that the challenged speech was part of the employee's "official duties," the Court left that phrase undefined, but noted that "[f]ormal job descriptions" are not a dispositive factor. Id. at 424-25. Instead, "[t]he proper inquiry is a practical one." Id. The Supreme Court further clarified Garcetti's "official duties" language in Lane v. Franks, 134 S. Ct. 2369 (2014), noting that "[t]he

critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id. at 2379.

Lane's gloss on Garcetti has led to some uncertainty within this Circuit, as a job responsibility may be a part of an employee's "official duties" even though he does not "ordinarily" perform the task. See Mpoy v. Rhee, 758 F.3d 285, 295 (D.C. Cir. 2014) (questioning whether Lane's "use of the adjective 'ordinary' . . . could signal a narrowing of the realm of employee speech left unprotected by Garcetti"). Until such time as the Supreme Court or the D.C. Circuit holds differently, however, the operative test in this Circuit deems employee speech as "pursuant to his official duties" when he "reports conduct that interferes with his assigned duties, even if the report is made outside his chain of command." Winder v. Erste, 566 F.3d 209, 215 (D.C. Cir. 2009); see also Mpoy, 758 F.3d at 294-95 (noting in dicta that Lane "does not directly or necessarily contradict Winder's application of Garcetti"); Martin v. District of Columbia, 78 F. Supp. 3d 279, 323-25 (D.D.C. 2015) (using Winder).

In undertaking its inquiry here, consequently, the Court must distinguish speech "related to the speaker's duties" — which could be protected — from that made "pursuant to his duties" — which is not. Garcetti, 547 U.S. at 421 (emphasis added). Notably, the inquiry is an objective, not a subjective, one. Id. at 425 (framing question as whether speech involves duties employee was "expected to perform"); Ezuma v. City Univ. of New York, 665 F. Supp. 2d 116, 129 (E.D.N.Y. 2009) ("Garcetti makes it clear that the focus is on the objective assessment of the employee's job responsibilities, since one purpose of the rule laid down by the Supreme Court is to prevent undue interference in a public employer's ability to run its organization and discipline employees."); Doucette v. Minocqua Hazelhurst, Lake Tomahawk Joint Sch. Dist. No. 1, No. 07-

292, 2008 WL 2412988, at *7 (W.D. Wis. June 12, 2008) ("Garcetti suggests that if anyone's perception matters, it is the employer's.").

Lewis first contends that protesting the policy "could not be further from the types of HR advice that [she] was responsible to provide." Pl. MSJ at 26. On the undisputed facts of the record before it, the Court is not persuaded. Her formal position description included the following duties:

> [S]erve[] as expert advisor and consultant on the most complex, sensitive, and novel personnel management issues and projects that demand a high degree of competency, professionalism, discretion and interpersonal skills. Assigned to identify, evaluate, and recommend solutions to personnel issues or problems of an especially complex, difficult, or sensitive nature in the agency. . . .
>
> Provide[] human resources support, guidance and advisory services to administrative, managerial, and supervisory personnel. Provide[] guidance and assistance in the development and submission of personnel action requests related to position descriptions, incentive awards, proposals for adverse actions, grievances, and appeals, performance evaluations, hours of duty, leave and pay administration, and other human resources matters related to Position Classification, Staffing, Training, Records Management, and Employee Relations.
>
> Serve[] as the OCME personnel liaison. Meet[] with, and coordinate[] with the D.C. Office of Personnel, on issues under consideration by managers and staff of OCME. . . .
>
> The purpose of contacts is to obtain, provide, and exchange information relative to regulations and procedures of Office of Chief Medical Examiner, as it relates to human resources management. The incumbent gives advice and resolves problems, makes recommendations and explains rules and regulations.

Position Description at 1-2 (emphasis added).

Of course, formal job descriptions are "neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First

Amendment purposes," <u>Garcetti</u>, 547 U.S. at 424-25, but they are still relevant to the objective inquiry of what tasks were within Lewis's "official duties." <u>Alves v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 804 F.3d 1149, 1161 (11th Cir. 2015) ("Practical factors that may be relevant to, but are <u>not</u> dispositive of, the inquiry include the employee's job description."); <u>see also</u> <u>Thompson v. District of Columbia</u>, 530 F.3d 914, 916 (D.C. Cir. 2008). Official job responsibilities include "both [Plaintiff's] day-to-day duties and her more general responsibilities." <u>Trigillo v. Snyder</u>, 547 F.3d 826, 829 (7th Cir. 2008).

Lewis describes her job duties as classifying positions, writing position descriptions, recruitment activities, timekeeping activities, and interpreting "architecture for the reporting requirements of the supervisor to employee matrix." Def. MSJ, Exh. N (Deposition of Patricia Lewis) at 17:15-21; <u>see also</u> Pl. MSJ at 25-26 ( asserting that her job entailed "advising OCME administrative, managerial, and supervisors, in regard to specific and individual employment issues like incentive awards"). Other evidence in the record from both parties, however, indicates a broader job role.

For example, in her July 20 letter, Lewis acknowledges that she asked a lot of questions during the July 18 meeting but notes that "[a]s the agency's HR Advisor [she] might have taken a different approach if [she] had prior knowledge or involvement in this process." July 20 letter at 2. Also telling is that Plaintiff's "first reaction" upon hearing the policy "was that this was not what most people signed up for. . . . [T]he actual applications that they submitted for the positions that they held, the job announcements did not dictate any conditions of employment having to do with drugs and alcohol." Lewis Dep. at 39:16-22. She also describes her chief "motivating factor[]" in objecting to the policy as "[p]rotecting the privacy of <u>all staff</u>." Pl. Resp. to Def. SOF, ¶ 22-2 (emphasis added). Plaintiff appears to admit in her Reply that she

should have been consulted before DCHR rolled out this policy. See Pl. Reply at 15 ("[D]espite being the HR Management Liaison Specialist, she was shut out of all discussion about the move to the CFL and the drug testing policy announced by Mr. Tucker."). The focus of her speech was on how the policy affected personnel and their job descriptions — a task Lewis concedes is part of her "ordinary" duties. See Lewis Dep. at 91:1-22 (agreeing that she was bringing the grievance "on behalf of everyone"). Before she lodged any complaint or disagreement, moreover, DCHR listed her as the point of contact from whom all employees should request "additional information," suggesting that the District believed that Lewis was responsible for responding to employees regarding the policy. See Def. MSJ, Exh. E (Relocation Notification Letter). This evidence collectively shows that Lewis's speech did not merely "relate[] to" or "concern" her job duties, but was made "pursuant to" her role as an HR liaison. Hawkins, 923 F. Supp. 2d at 139; see Weintraub v. Bd. of Educ., 593 F.3d 196, 203 (2d Cir. 2010) ("[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."). Lewis's current attempt to minimize her role does not change the objective assessment that her job duties encompassed a grievance about the policy's effect on current employees.

Plaintiff's other arguments do not yield a different conclusion. She contends that because her complaints were directed to Tucker and the Mayor's office, rather than her OCME managers or supervisors, she could not have been performing official job duties. In doing so, she construes her chain of command too narrowly. See Winder, 566 F.3d at 214-15. Lewis did not directly report to the Mayor or Tucker but, as an agency employee, she was still within the executive branch. See D.C. Code § 5-1402(a) (establishing OCME as an executive agency under the Mayor). She undoubtedly skipped the line by making her complaint directly to Tucker and the

Mayor's office, but those individuals were still within her "chain of command."  Brockell v.

Norton, 732 F.2d 664, 667-68 (8th Cir. 1984) (mayor within chain of command for executive

agencies).

　　　　Plaintiff's next contention — that because her questions at the July 18 meeting and her

July 20 letter were not made "pursuant to normal departmental procedures," Pl. MSJ at 27, she

spoke as a citizen — begins on somewhat steadier ground but also ultimately falters.  The

support that she provides — namely, that she wrote the grievance "on her personal stationery,"

id., as opposed to OCME stationery — cannot bear the weight of her argument.  Though the

medium through which an employee speaks can inform the protection given the speech, asking

questions at an internal meeting and using the District's personnel procedures to write a

grievance letter are not so out of the ordinary so as to shift the character of Lewis's speech.

Compare Bowie, 642 F.3d at 1134 (affidavit drafted at direction of employer in response to

EEOC complaint employee speech), Winder, 566 F.3d at 215 (public-school transportation

manager's testimony before D.C. Council, complaint to D.C. Inspector General, and reports to

Special Master employee speech), and Mpoy, 758 F.3d at 291 (public-school teacher's email to

public-school chancellor protesting lack of resources employee speech), with Pickering v. Bd. of

Ed. of Tp. High Sch. Dist. 205, Will Cty., Ill., 391 U.S. 563, 563 (1968) (public-school teacher's

letter to local newspaper criticizing school district's proposals for revenue generation citizen

speech), and Lane, 134 S. Ct. at 2379-80 (employee spoke as citizen when giving sworn

testimony).

　　　　Finally, Lewis points to DCHR's process in formulating and announcing the policy as

indicative of her citizen role.  She asserts that her ignorance of the policy until the July 18

meeting — combined with her supervisors' attempts to discourage her from asking questions

surrounding its implications — is proof that she "was speaking as a concerned citizen," not in her HR role.  See Pl. MSJ at 28.  This Circuit, however, has made clear that employees can speak pursuant to their official job duties "even [when] supervisors discourage" their speech.  Thompson, 530 F.3d at 917; see also Winder, 566 F.3d at 215 (rejecting employee's assertion that he spoke as citizen because his supervisors "did not want him to speak candidly to officials").  DCHR chose not to consult Plaintiff before implementing this policy, but that does not detract from the fact that her job description envisions that such a policy would be precisely the sort of issue she would communicate about with either DCHR directly or her supervisors at OCME.

The Court is aware that Plaintiff's position as an HR liaison means that many, if not all, employee grievances will fall under the rubric of her "ordinary duties."  That unfortunate fact nevertheless cannot save her First Amendment claim.  Based on the undisputed facts, the Court finds that Plaintiff's job as an HR advisor included relating concerns about the new policy on behalf of OCME staff.  Her speech doing precisely that, therefore, is not protected by the First Amendment.

### 2.  *Balancing Test*

Even if the Court determined that Lewis was speaking as a citizen and not in her role as an HR liaison, she nonetheless fails the second prong of the four-part inquiry, which requires her to show that her "interest, as a citizen, in commenting upon matters of public concern" outweighs the government's "interest in promoting the efficiency of the public services it performs through its employees."  Bowie, 642 F.3d at 1133 (quoting Wilburn, 480 F.3d at 1149).  Defendants maintain that because of Lewis's role in HR, "she had an obligation to accurately inform OCME employees regarding the Mayor's Order and related policies, not to undermine"

them by vociferously objecting to the policy before the OCME staff at the July 18 meeting.  See Def. MSJ at 13.  The Court agrees.

Lewis spoke on a matter of significant concern but, balancing the governmental and personal interests "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public."  Connick v. Myers, 461 U.S. 138, 150 (1983).  "[T]he manner, time, and place of the employee's expression [is] relevant."  Rankin v. McPherson, 483 U.S. 378, 388 (1987).  Pertinent considerations also include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  Id. (citing Pickering, 391 U.S. at 570-73).  The government may not simply allege harm, but the court may draw "reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior."  Hall v. Ford, 856 F.2d 255, 261 (D.C. Cir. 1988).

Setting aside the manner in which Lewis spoke (which is contested), the time and place of her conduct weigh in favor of the government.  At the outset, the Court qualifies Defendants' reliance on cases that constrict the speech of high-level employees more than that of rank-and-file agency members.  See Def. MSJ at 14-15 (quoting O'Donnell v. Barry, 148 F.3d 1126, 1135-36 (D.C. Cir. 1998)).  Lewis was not a "high-level official," but she did have a leadership role.  Her position as a senior HR advisor, therefore, does subject her conduct to a higher standard than other line-level employees, even if not to the standard applicable to executives.  See Hall, 856 F.2d at 264 ("[T]he higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest.").

Part of her role as a management-liaison specialist was to "present and defend program proposals in conferences and meetings," as well as to "explain rules and regulations," such as a new drug-and-alcohol-testing policy. See Position Description at 4. As the face of HR, Lewis's complaints against the testing policy at the July 18 meeting and her subsequent grievance letter negatively affected the Agency's management of its affairs. Employees undoubtedly looked to Lewis for guidance on how to interpret the policy. By expressing her objections in front of the entire OCME staff — whom she was responsible for advising — and stating in her July 20 letter that she would refuse to sign the forms until the District completed a "reclassification and risk assessment," July 20 letter at 1, Plaintiff "impede[d] the performance of [her] duties [and] interfere[d] with the regular operation of the enterprise." Rankin, 483 U.S. at 388; see Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415 n.4 (1979) ("When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.").

Lewis was listed as the point person for OCME staff to receive additional information, but it is clear that, given her opposition to the testing, she would have been unable to provide advice aligned with management's goals. See Position Description at 3 (listing "rules, regulations, policies, []requirements, . . . [and] Mayor's Orders and Memoranda" as guidelines for Lewis's position). That alone is enough to tip the balance in the District's favor. See Hall, 856 F.2d at 265 (holding that employee can "be dismissed for expressing views on matters within the core of his responsibilities that reflected a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously"). Lewis's grievance, which arose "from an employment dispute concerning the very application of that policy to" her,

"threatened the authority of [her] employer to run the office." Connick, 461 U.S. at 153. In short, regardless of the manner in which she relayed her opposition, Lewis's public disagreement with the policy hindered the efficient operation of OCME. Having found that Plaintiff's speech is unprotected under the first two prongs, the Court need not reach the final two in granting summary judgment to Defendants. See Wilburn, 480 F.3d at 1151.

B.  Fourth Amendment (Count II)

The heart of this suit is Plaintiff's Fourth Amendment claim, which alleges that the testing policy constituted an unreasonable search. It is undisputed that an employer-mandated substance test implicates that constitutional provision, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Beginning with the basics, drug and alcohol tests are "searches" within the meaning of the Fourth Amendment, and random, suspicionless drug tests are "inherently suspect." Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ., 158 F.3d 361, 373 (6th Cir. 1998). When such searches "serve[] special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interest to determine" whether they are reasonable. Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989). That analysis requires courts to "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler v. Miller, 520 U.S. 305, 314 (1997). Here, both sides agree that the policy falls outside the "normal needs of law enforcement" and is governed by the line of cases beginning with Skinner v. Railway Labor Executives Ass'n, 489 U.S. 602 (1989), and Von Raab. The Court must therefore articulate the private and government interests at stake and then see which way the scales tip.

1. *Privacy Interests*

Because public employees "have a serious and legitimate privacy interest in not being subject to" random drug tests, Lewis begins with a robust privacy interest. See Stigile v. Clinton, 110 F.3d 801, 804 (D.C. Cir. 1997). To assess whether her interest is diminished at all, the Court must determine "the scope of the legitimate expectation of privacy at issue." Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack, 681 F.3d 483, 490 (D.C. Cir. 2012) (citation omitted). When "the government asserts 'special needs' for intruding on Fourth Amendment rights, . . . the specific context matters." Id. at 492. The potential frequency of drug testing, whether the test is pre- or post-employment, and the stringency of pre-employment checks have all been held to affect an employee's expectation of privacy. Id. at 493-94; Nat'l Treasury. Emps. Union v. U.S. Customs Serv., 27 F.3d 623, 629 (D.C. Cir. 1994). The Court takes these factors in turn.

First, there is no dispute that, had Lewis signed the acknowledgment form, she would have been subject to random drug and alcohol tests. See Def. Reply at 9. "Random drug testing represents a greater threat to an employee's privacy interest than does mandatory testing because of the 'unsettling show of authority that may be associated with unexpected intrusions on privacy.'" U.S. Customs Serv., 27 F.3d at 629 (quoting Von Raab, 489 U.S. at 672 n.2).

The final two factors are interconnected. Notably, the testing requirement was imposed upon Lewis as a condition of keeping her current job. In her words, she was "facing a Hobson's choice: either give up her Fourth Amendment rights or be fired." Pl. Reply at 18. Incumbent employees retain a higher privacy interest when random drug testing is foisted upon them. See Vilsack, 681 F.3d at 494; Willner v. Thornburgh, 928 F.2d 1185, 1190 (D.C. Cir. 1991) (distinguishing between drug testing as prerequisite for job applicant and "[t]he choice presented to current employees — undergo random drug testing or lose your job"). This is particularly true

when the employee's initial job screening was not extensive.  Vilsack, 681 F.3d at 494 (finding that privacy of Forest Service Job Corps employees remained "robust" because initial background check was not rigorous).  Neither party has indicated that Lewis underwent a stringent background check before her employment that would diminish her expectation of privacy.  See Lewis Decl., ¶ 39.  In sum, Lewis, an incumbent employee, had a legitimate and significant privacy interest.

### 2. *Government Interests*

In assessing the public interest, the Supreme Court and the D.C. Circuit have traditionally focused on the magnitude of the potential harm from an impaired employee, which in turn often depends upon the employee's position.  Compare Von Raab, 489 U.S. at 660 (upholding drug testing for jobs that involved either interdicting illegal drugs or carrying firearms), and Am. Fed'n of Gov't Emps., ALF-CIO v. Skinner, 885 F.2d 884, 889-90 (D.C. Cir. 1989) (drug testing for transportation-safety workers constitutional), with Nat'l Treasury Emps. Union v. Yeutter, 918 F.2d 968, 970 (D.C. Cir. 1990) (holding drug testing "of ordinary employees who are not suspected of on-duty drug use or impairment" unconstitutional), and Bolden v. Se. Pa. Transp. Auth., 953 F.2d 807, 823 (3d Cir. 1991) (holding that suspicionless drug testing of janitor violated Fourth Amendment because "the nature of a maintenance custodian's work does not appear to involve any great risk of causing harm to other persons"); see also Int'l Bhd. of Elec. Workers, Local 1245 v. Skinner, 913 F.2d 1454, 1462-63 & n.26 (9th Cir. 1990) (collecting cases).

Here, however, Defendants do not contend that anything about Lewis's position *per se* justifies a bodily intrusion.  Their argument, rather, is premised upon the wholesale classification of the CFL building as "protection sensitive" or "safety sensitive" and the resulting danger that

an impaired employee might cause.  See Def. Reply at 16; Pl. MSJ, Exh. 1 (Deposition of

Charles Tucker) at 118:16-22 ("In general, the building was being classified as safety-sensitive

based on the nature of the building and the security issues relating to what other occupants would

be [*sic*] in the building.").  According to the city, the design of the CFL meant that Lewis would

be able to gain entry to rooms containing sensitive and/or confidential material, the exposure of

which could disrupt the justice system.  See Def. MSJ at 25-26.  This unbridled access, they

conclude, necessitated blanket random drug testing.

Lewis's level of access is undoubtedly critical to the validity of the city's justifications,

but the parties disagree on this fundamental issue.  Defendants contend that her work area at the

CFL "would have been located in the fatality review section where staff review and work with

confidential and sensitive non-public information.  In addition, [P]laintiff's position would have

provided her access to secure areas where sensitive operations are conducted, confidential case

files are kept, and evidence is safeguarded, including the mortuary, toxicology, and investigation

divisions of OCME."  Def. SOF, ¶ 67; Def. MSJ, Exh. P (Deposition of Beverly Fields) at 153-

54 (Lewis would have had clearance to enter all divisions).  Lewis, however, vehemently denies

that she would have had access to anything other than confidential personnel files, an assertion

bolstered by testimony from other OCME staff members.  See Pl. SOF, ¶ 70; Pl. MSJ, Exh. 4

(Deposition of Dr. Marie Pierre-Louis), at 85:1-20, 90:20-91:1-20 (Lewis would not have had

access to areas outside of administrative offices or confidential information apart from HR files);

Def. MSJ, Exh. O (Deposition of Sharlene Williams) at 124:8-22, 127:9-22 (same).  She further

contends that any potential concerns could have "practically be[en] addressed," Vilsack, 681

F.3d at 490, through other means, obviating the need for suspicionless drug testing.  Given this

material dispute on a pivotal fact, summary judgment is inappropriate at this time.

A look at the District's specific proffered interests underscores this. The city identifies three in its Motion: (1) eliminating fraud, waste, and abuse; (2) safeguarding evidence and samples; and (3) maintaining a secure facility. As to the first interest, Defendants appear to hang their hat on the Court's pronouncement in Lewis I that "the city has an undeniable interest in eliminating fraud, waste and abuse among all of its employees." Lewis v. District of Columbia (Lewis I), 161 F. Supp. 3d 15, 25 (D.D.C. 2015) (internal quotation marks and citation omitted). That statement, however, was only a "preliminary observation," as the Court determined that Defendants had not yet had an "opportunity to make clear how the city's general interest in curbing corruption applies with particularity to individuals stationed at the laboratory." Id. Their attempt to do so now substantially depends on Lewis's level of access within the CFL. If Plaintiff could obtain only confidential HR files (to which she already had access in the old building), but not enter other key areas of the lab, the city's interest in preventing corruption does not outweigh her privacy interest. See Romaguera v. Gegenheimer, No. 91-4469, 1996 WL 229836, at *17-18 (E.D. La. May 3, 1996). A finding, however, that she would have been able to freely enter all or many departments could well outweigh her privacy interest.

So, too, with the city's second interest — safeguarding evidence and samples. Defendants weakly assert that if Plaintiff were under the influence of a substance at work, there would be a "risk of stolen or misplaced evidence." Def. Reply at 18. Unless the city means that she might appropriate narcotics evidence to feed a hypothetical drug habit — a scenario Defendants do not pursue — the Court has some doubt that this interest could pass muster even if Lewis had a backstage pass to all CFL departments. See Harmon v. Thornburgh, 878 F.2d 484, 491 (D.C. Cir. 1989) (rejecting government's argument that impaired employees with access to grand-jury proceedings present public safety threat because "[t]hat sort of indirect risk

. . . is wholly different from the risk posed" by the employees in <u>Skinner</u> and <u>Von Raab</u>).  The

viability of this interest, nevertheless, depends upon not only what information was actually

within Lewis's grasp and the "damage [that] could flow from a compromise of that information,"

<u>U.S. Customs Serv.</u>, 27 F.3d at 628, but also on whether blanket testing was necessary.  <u>Vilsack</u>,

681 F.3d at 490 ("[E]ven where the government asserts important interests, it must still

demonstrate an immediate threat to those interests that could not practically be addressed

through a suspicion-based approach in order to justify a suspicionless search under the Fourth

Amendment.").  Given the parties' differing accounts, these are questions of fact for a jury, not

the Court, to decide.

The city's final interest — maintaining a secure office — is too broad for the Court to

afford it any weight.  At the outset, the Court rejects Defendants' contention that the Mayor's

Order's intent "to prevent illegal drug use at the CFL" suffices as a justification.  <u>See</u> Def. Reply

at 18.  The D.C. Circuit has held that, although the government "has a legitimate interest in

ensuring that its employees obey the law," that interest "alone is not a sufficient predicate for

mandatory" drug screening.  <u>Harmon</u>, 878 F.2d at 490 (rejecting departmental integrity as a

sufficient governmental interest).

Nor is the Court persuaded by Defendants' assertion that exposure of "evidence used in

criminal prosecutions" and "confidential information pertaining to those matters" could lead to a

"disruption of the justice system."  Def. MSJ at 26.  "[T]he Government has a compelling

interest in protecting truly sensitive information," <u>Von Raab</u>, 489 U.S. at 677, but mere access to

sensitive material is not enough to support a bodily invasion.  <u>See Harmon</u>, 878 F.2d at 492

(holding that "government's interest in preserving all its secrets" cannot "justify the testing of all

federal prosecutors or of all employees with access to grand jury proceedings").  Neither does

"truly sensitive information" encompass all sensitive or confidential information.  Id.  Instead, there must be a "clear, direct nexus between the nature of the employee's duty and the nature of the feared violation."  Id. at 490.  In other words, Defendants fail to show how the purported interest in "maintaining a secure facility" bears any relation to the nature of Plaintiff's position as an HR advisor.

Finally, the District does not intimate that "[a] single drug-related lapse by [Lewis] could have irreversible and calamitous consequences."  Nat'l Fed'n of Fed. Emps. v. Cheney, 884 F.2d 603, 610 (D.C. Cir. 1989); Skinner, 885 F.2d at 892 (affirming mandatory, random urine drug tests for aircraft mechanics because "a drug-related lapse could portend irreparable injury to life and property"); Stigile, 110 F.3d at 805-06 (allowing random drug testing based on access to President and Vice President because "the harm that the government is seeking to avoid has the necessary immediate connection to the risk posed by a drug-using employee").  Given this Circuit's reluctance to permit drug testing based on office security alone and the Supreme Court's "caution . . . in approving this justification for testing," Harmon, 878 F.2d at 492, the Court finds Defendants' final interest unavailing.

* * *

Because the weight accorded to the city's interests depends upon the level and extent of Plaintiff's access — a material disputed fact — the scales are unable to clearly tip to either side as a matter of law.  The Court, accordingly, must deny both Motions for Summary Judgment as to the unreasonable-search claim.

C.  ADA (Count VIII)

Moving next to the ADA count, the Court notes that Lewis I dismissed this claim except to the extent that Plaintiff had alleged that the policy constituted an improper medical inquiry.

<u>See</u> 161 F. Supp. 3d at 32.  Specifically, Plaintiff alleges that the District illegally required her to disclose alcohol and prescription-drug use.  As with the Fourth Amendment count, genuine issues of material fact obstruct the path to summary judgment.

To begin, under the ADA, an employer cannot "make inquiries of an employee" as to the existence or extent of her disability unless such knowledge is "shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  "The business necessity standard is quite high, and is not to be confused with mere expediency."  <u>Cripe v. City of San Jose</u>, 261 F.3d 877, 890 (9th Cir. 2001) (internal quotation marks and citation omitted).  Other circuits have required employers to show "that the asserted 'business necessity' is vital to the business . . . and that the request is no broader or more intrusive than necessary."  <u>Conroy v. New York State Dep't of Correctional Servs.</u>, 333 F.3d 88, 97-98 (2d Cir. 2003) (citation omitted).  As just discussed, the District has not established beyond dispute here that the substance-use testing is job related or necessary.  <u>See</u> <u>Thomas v. Corwin</u>, 483 F.3d 516, 527 (8th Cir. 2007) (employer has burden to show job relatedness or business necessity).  To assist the parties going forward, the Court separately addresses the two remaining components of Plaintiff's ADA claim.

### 1.  *Alcohol Inquiry*

The Notice and Acknowledgment form distributed at the July 18 meeting stated that, upon signing, the employee would "be subject to drug and alcohol testing, unless [she] acknowledge[s] a drug or alcohol problem during the 30-day notification period."  Def. MSJ, Exh. G at 1.  Lewis argues that the District violated the ADA by requiring her to disclose alcoholism, a protected impairment and potential disability under the ADA.  Defendants first counter that <u>Lewis I</u> allowed Plaintiff's claim to go forward only as it relates to her prescription-drug use.  <u>See</u> Def. Reply at 21.  Not so.  The prior Opinion focused on impermissible drug

testing only because that was the emphasis of the parties' argument regarding dismissal.  See ECF No. 20 (Defs. Reply to Pl. Opp. to Mot. to Dismiss) at 7-8.  The Court never held that her improper-medical-inquiry claim was confined to this issue.  See Lewis, 161 F. Supp. 3d at 32 ("Lewis's improper-inquiry claim under Count VIII thus survives.").  The Complaint clearly alleges that both the alcohol and drug tests violate the ADA.  See Am. Compl., ¶¶ 86-93.  And Plaintiff incorporated these allegations, albeit quite generally, in her Opposition to Defendants' Motion to Dismiss.  See ECF No. 19 (Opp. to Defs. Mot. to Dismiss) at 17 (citing Am. Compl., ¶¶ 87-93).

Defendants next assert that this claim nonetheless fails because "[t]he Amended Complaint is devoid of any allegation that alcohol addiction was [P]laintiff's 'known disability.'"  Def. Reply at 21.  Such a stance is irrelevant.  "It makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability."  Griffin v. Steeltek, Inc., 160 F.3d 591, 594 (10th Cir. 1998) (citation omitted).  Many circuits have therefore held that a plaintiff is not required to prove or allege a disability in order to challenge a medical inquiry under the ADA.  See Conroy, 333 F.3d at 94 (collecting cases).  Lewis's claim that the District improperly required her to disclose an alcohol-related disability, therefore, rises and falls on whether the city can show that such an inquiry was "job-related" or "vital" to its business needs.  Corwin, 483 F.3d at 527.  That, just like the Fourth Amendment claim, see Section III.B, *supra*, is a question for the jury.

### 2.  *Prescription-Drug Inquiry*

Plaintiff also alleges that the policy required her to disclose her prescription-drug regimen.  She points to Tucker's August 30 letter, which listed a number of controlled substances for which the drug test would screen but specifically exempted "authorized

prescription medications." Def. MSJ, Exh. I at 2. According to Lewis, that language means that, if she had a positive drug test, she would have to disclose her prescription medications in order to show that they were "authorized." She also avers that DCHR's compliance manager, Asha Bryant, told the OCME staff at the July 18 meeting that they would have to reveal their prescription medications if the test came back positive. See Lewis Decl., ¶ 4. Defendants, unsurprisingly, contest this version of the facts. They argue that Lewis would not have been required to disclose any prescription medications "on the acknowledgment forms or otherwise." Def. SOF, ¶ 25. This factual dispute cannot be decided on summary judgment.

D. Claims Against Tucker

Finally, Plaintiff brings a Fourth Amendment claim and a common-law IIED claim against Tucker, the former DCHR General Counsel, whom Lewis may sue only in his individual capacity. See Lewis 161 F. Supp. 3d at 36 (dismissing causes of action brought against individual Defendants in their official capacities as redundant of those against District). The Court looks at the counts separately.

1. *Fourth Amendment (Count II)*

Plaintiff's Fourth Amendment claim against Tucker is coterminous with that against the District. To establish liability, she must show: (1) a Fourth Amendment violation that (2) Tucker caused while (3) "acting under color of state law." Kentucky v. Graham, 473 U.S. 159, 166 (1985); see also Int'l Action Ctr. v. United States, 365 F.3d 20, 27 (D.C. Cir. 2004) (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976) (plaintiff must produce evidence that defendant had "direct responsibility" for constitutional deprivation, either through his own actions or by giving "authorization or approval of such misconduct")). Lewis and Tucker disagree as to whether she has proved the second prong, but summary judgment for her is inappropriate here for a more

28

fundamental reason. Because, as explained in detail above in Section III.B, *supra*, the Court cannot at this time determine "whether the plaintiff has alleged the deprivation of an actual constitutional right at all," Wilson v. Layne, 526 U.S. 603, 609 (1999), neither party can prove the first prong as a matter of law. As to his motion, conversely, Tucker has not rebutted the allegation that he acted under color of state law. This count therefore can proceed to trial.

2. *Intentional Infliction of Emotional Distress (Count VI)*

Plaintiff also alleges IIED based on Tucker's alleged misinformation regarding the policy and intimidation to sign the acknowledgment forms. See Lewis Dep. at 183-184 (stating Tucker caused emotional distress by "threat of job loss" and "ma[king] demands that were inconsiderate of time"). The facts, however, simply do not approach the standard required for this tort.

To succeed on an IIED count, Lewis must show that Tucker "engaged in (1) extreme and outrageous conduct which (2) intentionally or recklessly (3) caused [her] severe emotional distress." King v. Kidd, 640 A.2d 656, 667-68 (D.C. 1993) (internal quotation marks and citations omitted). Even if Plaintiff were able to show her version of the facts to be correct, no reasonable jury could find that Tucker's conduct was "extreme" or "outrageous." Amobi v. Dist. of Columbia Dep't of Corrections, 755 F.3d 980, 995 (D.C. Cir. 2014) (defining such conduct as going "beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community") (citation omitted). The standard for IIED claims is particularly "demanding" in the employment context. Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997) (employee allegation that supervisor targeted him for sexual-harassment investigation and manufactured evidence against him not outrageous); Williams v. Fed. Nat'l Mtg. Ass'n, No. 05-1483, 2006 WL 1774252, at *10 (D.D.C. June 26, 2006) (plaintiff's allegations that defendants conspired to terminate him and damage his personal

and business reputation "fail[ed], as a matter of law, to rise to the level of extreme and outrageous conduct under District of Columbia law"). Nor has Plaintiff introduced any evidence showing that he caused her "severe emotional distress." Bonner v. S-Fer Int'l, Inc., 207 F. Supp. 3d 19, 26 (D.D.C. 2016) (emphasis added); see Lewis Dep. at 184:3-5 (noting only that Tucker's actions were "worrisome and troubling"). The Court thus grants Tucker summary judgment on the IIED count.

**IV.  Conclusion**

For these reasons, the Court will grant Defendants' Motion for Summary Judgment as to Counts VI and IX. The Court will deny both parties' Motions as to Counts II and VIII. A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:  October 18, 2017