**PATRICIA D. LEWIS,**

    **Plaintiff,**

      **v.**                              **Civil Action No. 15-521 (JEB)**

**THE DISTRICT OF COLUMBIA,**

    **Defendant.**

## MEMORANDUM OPINION

"[P]ublic employees do not surrender all their [constitutional] rights by reason of their employment." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Rather, the Fourth Amendment still governs public workplaces, protecting most employees against random, suspicionless drug testing while on the job. The District of Columbia nevertheless instituted such a regime for its new Consolidated Forensics Laboratory, a facility that houses several law-enforcement agencies. It gave Plaintiff Patricia Lewis, a human-resources liaison in that office, two choices: submit to testing or be fired. Lewis chose the latter course, and when the District dismissed her, she responded with this lawsuit. The case ultimately proceeded to trial, where a jury resolved all contested facts in her favor and awarded her $802,800. Unhappy with this result, the District now moves for judgment as a matter of law or, alternatively, asks the Court to either order a new trial or reduce Lewis's damages. The Court will deny the Motion across the board.

## I.    Background

The Court begins with the facts that emerged at trial, resolving, as it must given the verdict, all reasonable inferences in Plaintiff's favor. It then recounts the case's procedural history.

A.    Factual History

For the better part of a decade, Lewis worked as a "Human Resources Advisor,"

"Management Liaison Specialist" in D.C.'s Office of Chief Medical Examiner.  See Trial Tr.

(Mar. 13, 2018) at 4:1-4, 11-23. OCME's duties include conducting autopsies as well as other

forensic and medico-legal investigations.  See Trial Tr. (Mar. 12, 2018) at 41:11-13; see also

D.C. Code § 5-1401 *et seq.*  From the time she was hired until October 2012, OCME was located

in an office building at 1910 Massachusetts Avenue in Southeast Washington.  See Tr. (3/13) at

24:16-21.

At some point, the city developed plans for the Consolidated Forensic Laboratory.  See

Tr. (3/12) at 58:8-11.  This new laboratory would house under one roof a number of city

departments, including OCME, the Public Health Laboratory, and the Mobile Crime Unit of the

Metropolitan Police Department.  Id. at 59:21-24; see also D.C. Council Resolution No. 19-726

§ 2(b) (Dec. 4, 2012).  On June 18, 2012, Mayor Vincent Gray signed Order 2012-84, providing

authority for the Director of the D.C. Department of Human Resources to "identify[] and

designat[e] high-risk or sensitive positions" for employees who would have a duty station at the

CFL.  See Pl. Exh. 4 at 2.  Employees so designated would be subject to "background checks,

investigations, mandatory criminal background checks, and[/or] test[ing] for controlled

substance use."  Id.

On July 18, 2012, Charles Tucker, the DCHR General Counsel, and other members of the

department held a meeting at OCME, see Tr. (3/12) at 67:5-7, 68:7-16, informing the staff that

all employees moving to the CFL would be "subject to mandatory criminal background checks

and testing for controlled substance use."  Pl. Exh. 6.  DCHR also distributed several forms,

including an "Individual Notification of Requirements Form for Drug and Alcohol Testing."  Pl.

Exh. 7 (Notice and Acknowledgment Form).  Citing the Mayor's Order, it stated:

> [T]his notice informs you that you have been appointed to, or you currently occupy, either as an employee or volunteer, a covered position that makes you subject to drug and alcohol testing. . . . Thirty (30) days after you acknowledge receipt of this advance written notice, you will be subject to drug and alcohol testing, unless you acknowledge a drug or alcohol problem during the 30-day notification period.

Id.  The bottom portion of the notice, titled "Acknowledgement of Receipt," required the

employee's signature, which would be an admission that she "currently occup[ied] a protections-

sensitive position that is subject to drug and alcohol testing."  Id.

Plaintiff immediately voiced her objections to the policy at the meeting and refused to

sign the form.  See Tr. (3/13) at 40:21-25; 50:6-10.  Although she was not taking illegal drugs or

abusing alcohol, id. at 46:4-8, Lewis feared she would need to reveal her prescription

medications to explain any positive test results.  Id. at 63:2-13.  Two days after the meeting, she

thus sent a grievance letter to Tucker protesting the policy.  See Pl. Exh. 8.  In that letter, she

maintained that she "was hired into a non-sensitive position that has not been re-classified nor

designated as high risk" and would not sign the acknowledgment form until DCHR conducted a

"reclassification and risk assessment."  Id.  On August 30, 2012, Tucker denied the grievance.

See Pl. Exh. 9.

In October 2012, DCHR Director Shawn Stokes sent Lewis a follow-up notice,

requesting that she sign and return the notice-and-acknowledgment forms, but Plaintiff refused to

do so.  See Pl. Exh. 10; see Tr. (3/13) at 64:21-23.  Later that month, a second notice further

advised that "corrective and/or adverse action" could result if she did not "comply with this

process" by November 8, 2012.  See Pl. Exh. 3.  At the same time, OCME began the move to the

CFL.  See Tr. (3/13) at 65:5-8.  On October 23, Lewis attempted to transport some of her files —

apparently with her supervisor's acquiescence — into the new building but was escorted out of

the facility.  Id. at 70:16-76:1.  While the rest of the OCME staff completed its move to the CFL,

Lewis remained alone at 1910 Massachusetts Avenue, in an aging building with no working heat,

elevators, or phones.  Id. at 77:4-7, 82:4-83:8.

Plaintiff nonetheless continued to work there until she received an Advance Written

Notice of Proposed Removal on January 3, 2013, when she was placed on administrative leave.

See Pl. Exh. 11.  The letter charged her with "neglect of duty and insubordination" on three

occasions: (1) refusing to sign the notice-and-acknowledgment forms on July 18; (2) refusing to

sign the forms after the October follow-up letters; and (3) attempting to move into the CFL

without being cleared.  Id. at 1-2.  On April 9, 2013, the District officially terminated Lewis

based on the same charges.  See Pl. Exh. 12.  She has not worked since, either for the city or

anywhere else.  See Tr. (3/13) at 112:8-12.

    B.    Procedural History

Nearly two years after her termination, Lewis filed this suit against the District (along

with several individual Defendants, all of whom were later dismissed).  She brought a host of

claims, but only two survived summary judgment: (1) a count for violation of the Americans

with Disabilities Act; and (2) a count for violation of the Fourth Amendment.   See Lewis v.

Gov't of Dist. of Columbia, 282 F. Supp. 3d 169, 190 (D.D.C. 2017).

     This latter count is the "heart" of Plaintiff's suit and alleges "that the [District's] testing

policy constituted an unreasonable search."  Id. at 184.  As the Court explained previously,

"[D]rug and alcohol tests are 'searches' within the meaning of the Fourth Amendment, and

random, suspicionless drug tests are 'inherently suspect.'"  Id. (quoting Knox Cty. Educ. Ass'n

v. Knox Cty. Bd. of Educ., 158 F.3d 361, 373 (6th Cir. 1998)).  When such searches "serve[] special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine" whether they are reasonable.  See Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989).

The question of whether a "drug testing program . . . comport[s] with the Constitution" is "a matter of law."  Boyd v. Coleman, 906 F.2d 783, 783 & n.3 (D.C. Cir. 1990) (*per curiam*) (unpublished).  At summary judgment, the Court thus undertook "a context-specific inquiry, examining closely the competing private and public interests advanced by the parties."  Chandler v. Miller, 520 U.S. 305, 314 (1997).  On the one hand, it concluded that Lewis had "'a serious and legitimate privacy interest in not being subject to' random drug tests."  Lewis, 282 F. Supp. 3d at 184 (quoting Stigile v. Clinton, 110 F.3d 801, 804 (D.C. Cir. 1997)).  The public interest, however, was more equivocal.  Defendants contended that "[P]laintiff's position [at the CFL] would have provided her access to secure areas . . . , including the mortuary, toxicology, and investigation divisions of OCME."  Id. at 186 (citation omitted).  Lewis, meanwhile, "vehemently denie[d] that she would have had access to anything other than confidential personnel files."  Id.

In light of that "material disputed fact," the Court held that the scales did not "clearly tip to either side."  Id. at 188.  It made manifest, however, that if "Plaintiff could obtain only confidential HR files (to which she already had access in the old building), but not enter other key areas of the lab, the city's interest in preventing corruption does not outweigh her privacy interest."  Id. at 186.  By contrast, a "finding . . . that she would have been able to freely enter all or many departments could well outweigh her privacy interest," assuming, of course, that

alternative arrangements were not otherwise practical. Id.; see also Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack, 681 F.3d 483, 490 (D.C. Cir. 2012) ("[E]ven where the government asserts important interests, it must still demonstrate an immediate threat to those interests that could not practically be addressed through a suspicion-based approach in order to justify a suspicionless search under the Fourth Amendment.").

This case thus proceeded to trial, where the Court employed a special-verdict form precisely tailored to those questions. For her Fourth Amendment count, it asked the jury whether Lewis had proven by a preponderance of evidence that either:

> (1) "[U]pon moving to the new CFL, she would not have had access to confidential and sensitive information within OCME (beyond the personnel and employment files she previously could access)"; or

> (2) "[I]f she would have had such access, the District could have practically addressed its security and confidentiality concerns through alternative means."

ECF No. 80 (Verdict Form). The verdict form then asked whether Lewis had established an ADA violation and instructed the jury that if they answered "'Yes' to any of the three Questions," they should then proceed to calculate the amount of damages, if any, to award her. Id. Though the jury rejected Lewis's ADA claim, it found in her favor on Question 1, awarding her $802,800.

## II.  **Legal Standard**

The District first moves under Federal Rule of Civil Procedure 50(a)(1), which provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the trial court may enter judgment as a matter of law on that issue. In evaluating such a motion, the court cannot "lightly disturb a jury verdict. Judgment as a matter of law is

appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." Muldrow v. Re–Direct, Inc., 493 F.3d 160, 165 (D.C. Cir. 2007) (internal quotation marks and citation omitted). This Court "cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence." Scott v. District of Columbia, 101 F.3d 748, 753 (D.C. Cir. 1996).

Federal Rule of Civil Procedure 59(a)(1), meanwhile, states that after a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the issues . . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Although this articulation is less than helpful, other circuits have expanded on its meaning. See, e.g., EEOC v. New Breed Logistics, 783 F.3d 1057, 1066 (6th Cir. 2015) ("The language of Rule 59(a) has been interpreted to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by . . . the verdict being against the weight of the evidence [or]. . . the trial being unfair to the moving party in some fashion.") (internal quotation omitted); Venson v. Altamirano, 749 F.3d 641, 656 (7th Cir. 2014) (same). In all cases, Rule 59 "is not a vehicle for relitigating old issues, presenting the case under new theories, [or] securing a rehearing on the merits." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998).

## III. Analysis

Ordinarily, the jury has the final word at trial; indeed, this is an integral part of having juries adjudicate disputes in the first place. If the losing party hopes for a different result, it faces a heavy burden, as the Court is not prone to "lightly disturb a jury verdict." McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000). Perhaps recognizing as much, the District takes a slightly different tack here. It maintains that the "verdict (and the Court's prior [Opinions]) did not

conclusively establish" liability at all; in other words, there are no "findings" for this Court to

disturb in vacating the judgment. See JMOL at 8. The Court, the city posits, should simply enter

judgment in its favor instead. Alternatively, it argues that the jury lacked sufficient evidence to

find for Lewis and that the damages were excessive. The Court looks at each contention

separately.

A.    Verdict

Lewis sued the District under 42 U.S.C. § 1983, which required her to (1) establish a

predicate constitutional violation; and (2) show that the municipality's "custom [or] policy"

caused the violation. Brown v. Dist. of Columbia, 514 F.3d 1279, 1283 (D.C. Cir. 2008); see

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). Defendant alleges that neither the

Court nor the jury found it liable on either score, such that the judgment in Lewis's favor should

be "vacated." JMOL at 11.

1. *Constitutional Violation*

The city first argues that "there was no finding at trial that [its] random drug testing

policy was 'unreasonable' so as to establish a predicate constitutional violation." ECF No. 84

(Def. Mot.) at 1. As the Court previously explained, however, "The fourth amendment status of

[a] defendant['s] [drug-testing] program is a question of law." Boyd, 906 F.2d at 783 n.3

(emphasis added); see also Ferguson v. City of Charleston, 532 U.S. 67, 73 (2001). It should

come as no surprise, then, that courts have repeatedly evaluated government testing programs at

the summary-judgment stage. See, e.g., Lebron v. Sec'y of Fla. Dep't of Children & Families,

772 F.3d 1352 (11th Cir. 2014) (striking down state's drug-testing program); Nat'l Treasury

Emps. Union v. U.S. Customs Serv., 27 F.3d 623, 624 (D.C. Cir. 1994) (granting summary

judgment to Government).

Although this case went to trial, "[t]he task of balancing the competing interests" remained one for "courts, not . . . juries." Bolden v. Se. Penn. Trans. Auth, 953 F.2d 807, 822 n.23 (3d Cir. 1991) (holding district court had erred by instructing "the jury to balance [plaintiff's] privacy interests against [Government's] asserted need for testing"). In such a scenario, "a judge [should] decide the objective reasonableness issue once all the historical facts are no longer in dispute" and may use "special interrogatories as a means to that end." Curley v. Klem, 499 F.3d 199, 210 (3d Cir. 2007) (internal quotation marks omitted); see also Ferguson, 532 U.S. at 74 & n.6 (approvingly citing instructions that informed jury a urine test would be unreasonable unless they determined, as a matter of fact, that plaintiffs consented to those searches).

The Court employed exactly that procedure in this case. Federal Rule of Civil Procedure 49(a) allows courts to issue a "special verdict," including "written questions" for "each issue of fact." "When Rule 49(a) is employed, the jury makes specific factual findings; and the judge makes the ultimate legal conclusions based on those facts." Mason v. Ford Motor Co., Inc., 307 F.3d 1271, 1274 (11th Cir. 2002). Here, the Court had previously identified the two predicate facts necessary to decide Fourth Amendment reasonableness as a matter of law: (1) whether Lewis would have access to confidential information in the CFL (beyond those personnel files to which she previously had access); and (2) if so, whether the District could have practically addressed its concern through alternative means. See Lewis, 282 F. Supp. 3d at 186, 188. It therefore submitted a special-verdict form to the jury encompassing both questions. See Verdict Form.

While the District objected to the jury instructions during trial, see JMOL at 15 n.4, it no longer maintains that the use of a special-verdict form was improper *per se*. Instead, its

complaint is more technical: "[R]egardless of whether the reasonableness of the search under the Fourth Amendment is to be determined by the Court or the jury," it says, "the Court did not make a specific finding" that the policy was unreasonable in this case.  See JMOL at 9, 11.  On the contrary, the Court repeatedly made clear that reasonableness would hinge on Lewis's level of access.  In its prior Opinion, it stated unequivocally that if "Plaintiff could . . . not enter other key areas of the lab, the city's interest in preventing corruption <u>does not</u> outweigh her privacy interest."  <u>Lewis</u>, 282 F. Supp. 3d at 186 (emphasis added).  Even were that holding ambiguous, the Court reiterated the same point when proposing its jury instructions to counsel.  It stated, on the record, that its "prior opinions" had "made the determination on reasonableness [that] if there is access by the plaintiff to the sensitive and confidential material then the testing would be reasonable, but if there isn't, then it's not."  Trial Tr. (Mar. 15, 2018) at 9:22-10:3.

The Court instructed the jury as much.  It explained that Lewis was challenging the District's "suspicionless drug-testing policy [as] a[n] unreasonable search of her person."  Trial Tr. (Mar. 16, 2018) at 10:19-25.  It then explained that to "prevail on this claim" — *i.e.*, to prove the District's policy was an unreasonable search — Lewis must prove by a preponderance of evidence that either:

> (1)  "Upon moving to the new CFL, she would not have had access to confidential and sensitive information within OCME (beyond the personnel and employment files she previously could access)"; or
>
> (2)  "If she would have had such access, the District could have practically addressed its confidentiality and security concerns through alternative means."

<u>Id.</u> at 11:1-10; <u>see also</u> ECF No. 80.  Once the jury found in Lewis's favor on the first question, the Court had all the information needed to enter judgment in her favor.  See ECF No. 82 (Judgment).

Even were there ambiguity about the basis for that judgment, the District never explains how such a shortcoming would warrant vacating the judgment (much less "enter[ing] judgment in [its] favor"). <u>See</u> JMOL at 2. As it acknowledges, "With a special verdict, the jury's sole function is to determine the facts; the jury needs no instruction on the law because the court applies the law to the facts as found by the jury." <u>Mason</u>, 307 F.3d at 1274; <u>see also</u> JMOL at 10. The only problem here, according to the District, was that the "balancing [test] was not later performed by either the jury or the Court." <u>Id.</u> at 9. To the extent there is any confusion, the Court can easily repeat the balancing test as a matter of law now – after all, it is "the <u>court</u> [that] applies the law to the facts." <u>Mason</u>, 307 F.3d at 1274. Lest there be any doubt, it therefore holds that the scales tip in Lewis's favor. The District, accordingly, violated her Fourth Amendment rights by mandating she submit to its suspicionless drug-testing regime.

### 2. *Municipal Policy*

The District next claims that there was no "finding by the jury that the violation was caused by [its] custom, policy, or practice." JMOL at 11. Until now, however, the city never disputed that question, nor could it seriously do so. To hold a municipality liable under section 1983, a plaintiff must show "that [the city] maintained a policy or custom that caused the violation of his or her constitutional rights." <u>Kenley v. Dist. of Columbia</u>, 83 F. Supp. 3d 20, 34 (D.D.C. 2015). "There are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983," chief among them "the explicit setting of a policy by the government that violates the Constitution." <u>Baker v. Dist. of Columbia</u>, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

In this case, Mayor Vincent Gray issued an order on June 18, 2012, requiring the D.C. Department of Human Resources to determine, on a case-by-case basis, whether certain

"sensitive positions" should be subject to random testing.  See Pl. Exh. 4.  In "accordance" with

that order, DCHR so designated all employees moving to the CFL, see Pl. Exh. 6, and required

them to sign a form "acknowledge[ing]" that they "currently occupy a protections-sensitive

position []subject to drug and alcohol testing."  Pl. Exh. 7.   On December 22, 2012, the D.C.

Council passed an Emergency Act specifying that a "failure to sign the required documents or

otherwise cooperate with any part of the drug testing requirements shall result in termination of

the employee's employment."  Pl. Exh. 5 at 2.  Finally, on January 3, 2013, Lewis received a

letter notifying her that she was being "remove[d] . . . for cause" due to "neglect of duty and

insubordination."  Pl. Exh. 11.  More specifically, it informed her that she had "failed to comply

with the requirement stated" on the District's Drug and Alcohol Testing form, and that her

behavior "serves as a violation of Mayor's Order 2012-84 and the . . . Emergency Act of 2012."

Id.

The District does not dispute that the Mayor's Order and Emergency Act constitute

"policies" for purposes of section 1983.  From there, causation is equally straightforward.  In this

case, the constitutional violation occurred when DCHR insisted that Lewis submit to a

suspicionless drug test.  Those officials had not gone rogue.  Rather, they acted pursuant to a

Mayor's Order and, then, an Emergency Act.  Indeed, far from contesting this point during trial,

the District emphasized it repeatedly.  See, e.g., Tr. (3/12) at 26:1-2 (explaining during opening

statement that Lewis was fired because she "was insubordinate and refused to comply with

government policies") (emphasis added).  There is thus little question that the municipal policy

was "the moving force [behind] the constitutional violation."  City of Canton, Ohio v. Harris,

489 U.S. 378, 388 (1989) (alteration in original) (internal quotation marks omitted).

In any event, if the District had wanted the jury to find the obvious, it had every opportunity to do so before the Court submitted its special-verdict form to the jury. Rule 49 provides that a "party waives the right to a jury trial on any issue of fact . . . not submitted to the jury unless, before the jury retires, the party demands its submission to the jury." The District made no such demand here. While it objected generally to the Court's proposed interrogatories, it asked for the following instruction, which had no mention of causation:

> On Count I, has Ms. Lewis proved by a preponderance of the evidence that, it was unreasonable for the District of Columbia to designate her position "protection-sensitive," with the requirement that she be subject to random drug testing at the new CFL?

Def. Objections to the Court's Jury Instructions and Verdict Form at 2 (on file). Once the Court explained that it would retain the special-verdict form, the District suggested plenty of tweaks, but again never asked for a separate interrogatory about municipal liability. See Tr. (3/15) at 10:7-9. When, as here, "the party does not demand submission, the court may make a finding on the issue." Fed. R. Civ. P. 49(a)(3). The Court, for the reasons just explained, finds that the District's policy caused the Fourth Amendment violation. Even if the Court had made "no finding," it "is considered to have made [one] consistent with its judgment on the special verdict." Id. Its finding of municipal liability, of course, is consistent with judgment in Plaintiff's favor.

    B.    Insufficient Evidence

Moving to the merits, the District argues that "there was no substantial evidence that plaintiff would not have had access to confidential and sensitive information at the CFL." JMOL at 17 (internal quotation marks omitted). Because this sort of second guessing "intrudes upon the rightful province of the jury, it is highly disfavored." Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C. Cir. 1994). The D.C. Circuit has repeatedly emphasized that "[t]he jury's verdict must stand

unless the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable [people] could not disagree on the verdict." McNeal v. Hi–Lo Powered Scaffolding, Inc., 836 F.2d 637, 640-41 (D.C. Cir. 1988) (internal quotations and citation omitted). The Court "is limited to evaluating whether [the plaintiff] proffered sufficient evidence upon which a jury could properly base a verdict" in her favor. Boodoo, 21 F.3d at 1161 (internal quotation marks omitted).

Lewis easily clears that hurdle. The jury heard (often in excruciating detail) about the CFL's layout and Lewis's proposed access within it. To refresh, they learned that the CFL would bring together three agencies: the Mobile Crime Unit of the Metropolitan Police Department (later renamed the Department of Forensic Sciences), the Public Health Laboratory, and the Office of the Chief Medical Examiner (i.e., the agency where Lewis worked). See Tr. (3/12) at 59:21-24. Despite the shared space, however, those agencies remained "totally independent," and each occupied its own floor. Id. at 60:1-2. Critically, a key card was required to enter any given floor of the building, and no OCME employees had access to the other departments. Id. at 85:10-21.

At trial, Dr. Marie Pierre-Louis, the then-head of OCME, testified that she controlled the level of access her employees — including Lewis — would have within the agency. Id. at 65:5-7, 85:6-9. She testified expressly that Lewis would not "have had access to any confidential information apart from human resources files[.]" Id. at 89:15-19. More specifically, she explained that the agency's most sensitive departments, such as death investigations and autopsies, were located on the fifth floor, and Lewis would have no key-card access to that area. Id. at 85:22-25; 88:7-24. Instead, she could only access the sixth floor, which housed toxicology, fatality review, and administrative staff. Id. at 86:6-8, 87:13-22. Even within that space, the

Toxicology Department was "[c]ompletely separated," secured by separate key-card access. Id. at 86:23-25. Meanwhile, "[e]verything" within the Fatality Review section "was under lock and key." Id. at 54:21; id. at 100:6-8.

The District tries to paint Dr. Pierre-Louis's testimony as more equivocal, latching onto her concession during cross that it would not be "impossible" for Lewis to access secured areas of the CFL. Id. at 101:5. While Pierre-Louis acknowledged, as the age-old axiom teaches, that "[n]othing is impossible," id. at 101:6, she stressed that "the only way [Lewis] would have access to [those areas] would be that someone else introduced her into" them. Id. at 101:3-4. Such "access" is no access at all. At the summary-judgment stage, the District posited that Lewis would "have had clearance to enter all divisions," and this "unbridled access" required "blanket random drug testing." Lewis, 282 F. Supp. 3d at 186 (citations omitted). By contrast, had the District asserted only that Lewis might have gained supervised entry into sensitive areas, the Court would have rejected that weak interest out of hand. After all, the city's professed fear was that Lewis might, for instance, steal or "misplace[] evidence" or otherwise contaminate "samples." Id. (internal quotation marks omitted). It seems farfetched, however, that even a drug-addled employee could do so with a co-worker looking over her shoulder.

Next, the District makes much of the fact that "plaintiff's workstation would have been in the fatality review section, where sensitive and confidential non-public information is handled." JMOL at 18. True, Pierre-Louis acknowledged that Lewis's office within the CFL would be "close" to Fatality Review. See Tr. (3/12) at 88:1-3. She repeatedly emphasized, however, that those files, "as they were at 1910 [Massachusetts], were locked." Id. at 100:6-8; see also id. at 88:1-5. Indeed, Pierre-Louise testified that Lewis actually had "less access" to Fatality Review than at the old building, as she previously walked through that unit on a daily basis just to arrive

at her desk.  Id. at 111:8-14 (describing her as "more separated from [Fatality Review] than she was at 1910").  The jury therefore had no reason to assume she "would [] have had access to confidential and sensitive information within OCME (beyond the personnel and employment files she previously could access").  See Verdict Form (emphasis added).

Finally, the District alludes to testimony by Beverly Fields, the OCME chief of staff who claimed to "run[] the agency."  Tr. (3/15) at 88:18.  Fields testified that "Lewis [would] have had access to secured areas," such as the Mortuary Division, Toxicology Division, and Investigation Division.  Id. at 112:5-9; see also id. at 114:3-11.  She also maintained, however, that Lewis would have had the same "level of access at the Massachusetts Avenue facility."  Id. at 114:12-14.  If so, the move to the CFL would provide little reason to institute a new drug-testing regime.  In any event, Fields's testimony directly contradicted Pierre-Louis's statement that Lewis would not have access to confidential information, see Tr. (3/12) at 89:15-19, and "[r]esolving such conflicting [testimony] is precisely the type of function [courts] leave to the jury, not to a judge."  Morris v. McCarthy, 825 F.3d 658, 672 (D.C. Cir. 2016).  The jury here had ample reason to side with Pierre-Louis, as she, rather than Fields, made the final decisions regarding access.  See Tr. (3/12) at 53:11-17; 88:20-89:5.  The Court therefore declines to disturb the verdict here.

C.      Damages

Having failed to escape liability, the District alternatively tries to minimize its financial pain.  It asks the Court for a new trial or to reduce the damages, claiming that the award of $802,800 was excessive.  The Court may grant a new trial only when it "is convinced the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'"  Nyman v. Fed. Deposit Ins. Corp., 967 F. Supp. 1562, 1569 (D.D.C. 1997) (quoting Sedgwick v. Giant Food, Inc., 110 F.R.D. 175, 176 (D.D.C. 1986)).  In the

alternative, it can modify a jury's damages award if it is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Langevine v. Dist. of Columbia, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (citation omitted). The Court finds neither step appropriate here.

### 1. Economic Damages

The District first attacks the jury's award of economic damages, which totaled $499,800. At trial, Lewis pegged her economic loss at precisely that figure, based on five years of lost wages and benefits since her termination on April 9, 2013. See Tr. (3/13) at 113:1-114:22 (explaining expected salary, as well as five-percent contributions to her retirement account). Though Defendant did little to dispute those calculations at trial, it now argues that Lewis would have retired when she became eligible for Social Security, thereby reducing her total lost wages. While Plaintiff did testify to that effect, she left open the possibility that she might retire either at age 66 or 67. Id. at 151:1-7. If the former, she would have retired on April 3, 2017 (her 66th birthday), and been owed less than five years of damages. The latter date, by contrast, would accrue the full five years.

The District now cites evidence that Lewis would have been eligible for full retirement pay at age 66. See JMOL at 22 & n.5. The problem, however, is that it never presented such evidence at trial, despite prompting from the Court. When proposing jury instructions, the Court expressly raised the issue of wage calculations, noting Lewis's testimony "that she wanted to work until she was 66 or 67." Tr. (3/15) at 5:16-19. It allowed Plaintiff to argue for the full five years but reminded both parties that "[t]he District, of course, can argue that . . . she testifed [that] she only wanted to work five years past July 2012." Id. at 5:21-25. The District did not object, and while it briefly noted the discrepancy in closing, see Tr. (3/16) at 40:2-5, it never

substantiated that argument with evidence.  The jury was thus free to award Lewis the full amount.

Defendant more forcefully argues that Lewis failed to mitigate damages, as is required under section 1983.  See JMOL at 19-20 (citing Meyers v. City of Cincinnati, 14 F.3d 1115, 1119 (6th Cir. 1994); Fleming v. County of Kane, 898 F.2d 553, 561 (7th Cir. 1990)).  As the District's own citations make clear, however, "once the plaintiff has presented evidence of damages, the defendant has the burden of establishing a failure to properly mitigate damages."  Meyers, 14 F.3d at 1119 (emphasis added).  To do so, it "must establish that substantially equivalent positions were available and that the plaintiff failed to exercise reasonable care and diligence in seeking those positions."  Id.; see also Fleming, 898 F.2d at 560 ("In order to prove a failure on the part of the employee to mitigate, the employer must show . . . there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable dilligence.") (citation omitted).

Here, Lewis admitted that she had not applied for any new job since her termination, but "[t]he City presented no evidence that substantially equivalent positions were available" had she chosen to pursue them.  See Meyers, 14 F.3d at 1119.  Indeed, she offered compelling testimony to the contrary.  She explained that to find "substantially equivalent positions," id., she searched "public sector employment, specifically human resource jobs."  Tr. (3/13) at 110:15-17.  Each of those job applications, however, asked expressly whether she had previously been terminated, and, if yes, to explain why.  Id. at 110:17-22.  That disclosure would not only be personally embarrassing, but Lewis testified it would be a death knell to her application.  Id. at 110:25-111:10 (explaining that in her own role as an HR employee, she "would not adjudicate that information favorably").  That is true regardless of whether, as the District argues, it would have

reported her refusal to submit to a drug test. Even were the city mum, Lewis would still need to self-disclose the cause for her termination.

The District, of course, was free to contradict Plaintiff's testimony, such as by introducing its own expert to testify about "the number and availability of HR jobs in the public and [even] private sectors." Pl. Opp. at 20. It chose not to do so; indeed, it surprisingly offered <u>no</u> affirmative evidence regarding mitigation. It thus falls far short of meeting "its burden of establishing failure to mitigate." <u>Meyers</u>, 14 F.3d at 1119. Without more, the Court has no basis to reduce the award to the requested $125,000, much less order a new trial.

### 2. *Non-Economic Damages*

The District last challenges the jury's non-economic damages award of $303,000, claiming the Court should award it a new trial or, at least, "reduce the award of non-economic damages to no more than $50,000." JMOL at 25. The Court treads cautiously in considering that request, as it "must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." <u>Langevine</u>, 106 F.3d at 1024.

The city focuses primarily on the <u>fiscal</u> consequences of Plaintiff's job loss, including her testimony that she could no longer afford to cook gourmet meals, go to the movies, travel to see relatives, or pay her son's college tuition. <u>See</u> JMOL at 23-24. It overlooks, however, her extensive testimony about the <u>psychological</u> consequences of being fired. First, she testified that she was forced to work for months in an isolated building, with inadequate security, no heating, and a pervasive rodent problem. <u>See</u> Tr. (3/13) at 77:13-79:9, 82:4-83:16; <u>see also</u> Tr. (3/14) at 176:23-24. Second, she presented evidence that the District had posted her photo outside the new CFL, broadcasting her refusal to submit to a drug test for all to see. <u>Id.</u> at 104:5-25 (testifying the poster was "like [she] had been placed on the FBI's most wanted list").

She also testified to her anguish at being dismissed after an unblemished thirty-five-year career, as well as her inability to support her family.  See id. at 79:3-9; id. at 93:7-12.  Multiple family members similarly testified that after her termination, Lewis became "depressed."  See, e.g., id. at 172:3-9; id. at 179:14-16.  Once a "vibrant spirit," she "lost the desire to be in the world and exist."  Id. at 186:14-22.  She also let her appearance become "disheveled" and lost interest in activities she once loved, such as "attend[ing] church" on a weekly basis with her family.  Id. at 172:4-17.  Lewis's sister testified that she "almost stopped eating" altogether.  Id.  The District dismisses this behavior as "Lewis's own decision to 'self-isolate,'" JMOL at 25, but that does little more than blame the victim.  She became reclusive because the District fired her, and the jury was entitled to compensate her for such emotional harm.

The District's comparator cases, meanwhile, are not to the contrary.  It cites Nyman, a case in which the court reduced a $300,000 award to $175,000.  See 967 F. Supp. at 1572.  That case, however, is readily distinguishable.  As an initial matter, Nyman was decided two decades ago, and the inflation-adjusted value of $175,000 approaches the $303,000 awarded here.  See U.S. Bureau of Labor Statistics, CPI Inflation Calculator (last accessed May 30, 2018), available at https://www.bls.gov/data/inflation_calculator.htm.  The plaintiff there, moreover, sued under 42 U.S.C. § 1981a, which had a statutory cap of $300,000.  Anchored by that number, the court thought the "maximum amount recoverable under the applicable cap . . . should be reserved for the most egregious cases of unlawful conduct."  Nyman, 967 F. Supp. at 1572.  Finally, unlike in this case, the plaintiff "did not lose her employment" as a result of the defendant's retaliatory conduct, and the court adjusted her damages accordingly.  Id. (emphasis added).  The District's reliance on Spence v. Bd. of Educ., 806 F.2d 1198 (3d Cir. 1986), is similarly misplaced.  In Spence, the employee — a school teacher — was simply transferred from a high school to an

elementary school, with no job loss or pay reduction.  Id. at 1201.  By contrast, Lewis was not only fired, but also publicly shamed for her refusal to submit to a drug test.  See Tr. (3/13) at 108:7-110:11 (describing both her fear of losing her paycheck, and her anxiety at explaining her termination).

At bottom, "[c]ourts may not set aside a jury verdict merely deemed generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice."  Langevine, 106 F.3d at 1024.  This award, while generous, was not "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."  Id. (citation omitted).   The Court will therefore let it stand.

## IV.    Conclusion

For the foregoing reasons, the Court will deny the Government's Motion, thereby sustaining the judgment in Lewis's favor.  It will issue a contemporaneous Order so stating.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:  June 7, 2018