# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PATRICIA D. LEWIS,

      **Plaintiff,**

      v.

DISTRICT OF COLUMBIA
GOVERNMENT,

      **Defendant.**

Civil Action No. 15-521 (JEB)

## MEMORANDUM OPINION

Plaintiff Patricia Diane Lewis had worked in human resources for the District of Columbia's Office of the Chief Medical Examiner for decades before her employer first imposed suspicionless drug testing. Presented with a choice between acquiescing to this new requirement — to which she objected on privacy grounds — and being fired, Lewis chose door number two. When Defendant District of Columbia followed through on its threat to let her go, Plaintiff brought this suit. She alleged a bevy of constitutional and statutory violations against a host of defendants, under both D.C. and federal law, all of which relied on the same factual underpinning: the termination of her employment for refusing to submit to drug testing. Over the course of this litigation, Lewis's causes of action and the defendants against whom they were asserted were whittled down until a jury awarded Plaintiff over $800,000 on her Fourth Amendment claim against the District of Columbia Government. Lewis now seeks close to $1 million in attorney fees and expenses. The Court agrees that she is entitled to a sizeable fee award but takes issue with some of her calculations and requests. It will thus grant in part and

deny in part Plaintiff's Motion and will award her a total $592,719.92 in fees and $53,846.72 in costs and expenses.

## I.     Background

Given the nature of this Motion, the case's procedural history plays the starring role in the following rehearsal of the facts, relegating the conduct that led to this lawsuit to second fiddle. The Court thus directs any readers interested in the background of this case to the Court's now-extensive repertoire of prior Opinions on the subject. See Lewis v. Gov't of the Dist. of Columbia, 315 F. Supp. 3d 571 (D.D.C. 2018); Lewis v. Gov't of the Dist. of Columbia, 282 F. Supp. 3d 169 (D.D.C. 2017); Lewis v. Gov't of the Dist. of Columbia, No. 15-521, 2015 WL 8577626 (D.D.C. Dec. 9, 2015); Lewis v. Gov't of the Dist. of Columbia, 161 F. Supp. 3d 15 (D.D.C. 2015).

A long-time government employee, Lewis served as a human-resources management liaison for OCME. See ECF No. 101 (Pl. Mot.) at 2. In 2012, the City moved the Office from its Massachusetts Avenue home to a new forensics building as part of an effort to consolidate a number of departments under one roof. See Lewis, 315 F. Supp. 3d at 574. This relocation spurred the D.C. Government — acting on an order from then-Mayor Vincent Gray — to institute mandatory criminal-background checks along with drug and alcohol testing as a condition of the employees' transfer to the new facility. Id. Lewis objected. She first raised her privacy concerns verbally at the meeting in which OCME informed its employees of the new policy. Id. at 574–75. Despite repeated requests from management, Plaintiff continued to refuse to sign a form acknowledging the new policy. Id. at 575. Some nine months later, citing among other things Lewis's refusal to sign, the District fired her. Id. This termination prompted Plaintiff to seek the services of an attorney. She met with Charles Bonner, a California attorney

at the firm of Bonner & Bonner, who first attempted to negotiate her return to work.  See Pl.

Mot. at 1–3.  When these efforts bore no fruit, Lewis filed suit.

Her operative Complaint asserted eleven separate causes of action against five named

Defendants and fifty "Does," all stemming from her termination and the events preceding it.  See

ECF No. 7 (Am. Compl.).  In addition to suing the District of Columbia itself, Lewis also named

Vincent Gray, then the mayor; Charles T. Tucker, an attorney for the D.C. Government who first

informed Lewis of the mandatory drug testing and purportedly threatened to fire anyone who did

not comply; Beverly Fields, OCME's Chief of Staff; Paul Quander, D.C.'s Director of Public

Safety; and fifty unnamed parties whom Lewis promised to later identify.  Id. at 5.  Against these

Defendants, the Complaint alleged a barrage of claims.  Lewis asserted violations of the U.S.

Constitution (the First, Fourth, and Fifth Amendments), federal statutes (Title VII of the Civil

Rights Act of 1964, the Americans with Disabilities Act, and the Genetic Information

Nondiscrimination Act), a D.C. statute (the D.C. Human Rights Act), and D.C. common law

(defamation, intentional infliction of emotional distress, and wrongful termination).  Id. at 13–28.

Although styled as a cause of action, Plaintiff also tucked a request for declaratory and injunctive

relief amongst the counts of her Complaint.  Id. at 28.  This vast array of both causes of action

and Defendants previously led this Court to remark that Lewis's Complaint appeared as if

counsel had "toss[ed] any conceivable claim into the cauldron and give[n] it a mighty stir."

Lewis, 161 F. Supp. 3d at 23.

As the reader may have anticipated, not all these claims made it to trial.  First, on

December 7, 2015, the Court granted in part a Motion to Dismiss filed by a subset of the

Defendants.  See Lewis, 161 F. Supp. 3d at 37.  This Opinion removed some Defendants

altogether and limited the causes of action that could proceed against others.  More specifically,

the Court disposed of all causes of action against Gray and Fields, finding that any claim against them in their official capacity was redundant given Plaintiff's naming of the District. Id. at 36. The Court found that any individual-capacity claim, conversely, failed to allege sufficient personal involvement. Id. at 36–37.

The Court similarly held that a subset of the counts against the District failed to clear the Rule 12(b)(6) hurdle. All three common-law causes of action could not proceed because Plaintiff had forgone first seeking administrative redress pursuant to the District's Comprehensive Merit Personnel Act. Id. at 34–36. The same fate befell Plaintiff's procedural-due-process claim, but for a different reason: Lewis did not identify procedures she was owed but denied sufficient to raise her claim "above the speculative level." Id. at 31. Many of her statutory claims met the same end. The Court dismissed her Title VII discrimination count (which Lewis abandoned in her Opposition), Genetic Information Nondiscrimination Act count, and D.C. Human Rights Act count. Id. at 31, 33–34. It also narrowed Lewis's ADA claim, only permitting it to go forward to the extent she alleged that the District had made an improper inquiry into her medical history. Id. at 31–33.

The two additional Defendants — Tucker and Quander — filed a separate Motion to Dismiss. Two days after ruling on the first Motion, the Court granted the second Motion as to Quander, thus removing him from the case, but denied it as to Tucker. See Lewis, 2015 WL 8577626, at *1. The three counts asserted against him thus proceeded.

For those keeping score, three counts against each of two Defendants survived these proceedings: violations of the First Amendment, Fourth Amendment, and ADA against the District, and claims under the Fourth Amendment as well as the torts of IIED and defamation against Tucker.

Summary judgment took another bite out of Plaintiff's case. Lewis there voluntarily dismissed her defamation claim against Tucker and all causes of action against the still-unidentified Doe Defendants. See Lewis, 282 F. Supp. 3d at 177. The Court further narrowed the remaining scope of her Complaint. It held that summary judgment should be entered in favor of the District on the First Amendment claim and in favor of Tucker on IIED. Id. at 184, 190. Factual issues, however, prevented any ruling on the Fourth Amendment against both Defendants, which the Court characterized as "the heart of this suit." Id. at 184. It similarly found that factual questions most appropriate for a jury remained as to Plaintiff's ADA count asserted against the District. Id. at 188–89.

The enduring counts went to trial. Not all, however, made it to the jury. With one more turn in this saga, the Court granted Tucker's Rule 50 Motion following the close of Plaintiff's evidence, ending his role in this case. See 03/14/2018 Minute Entry. Lewis's remaining claims — now narrowed to two causes of action against one Defendant — were submitted to the jury, which found for her on the Fourth Amendment, but not on the ADA count. See Lewis, 315 F. Supp. 3d at 576. It awarded her a total of $802,800 in damages, composed of $499,800 in economic damages and $303,000 in non-economic damages. See Pl. Mot. at 1. And that is how, loyal readers, Lewis's case wound its way from an eleven-count Complaint against a host of Defendants to a victory on one claim against one Defendant.

But our train is not quite at the station. The District submitted extensive post-trial briefing, requesting that the Court reverse the jury's verdict and instead grant judgment in its favor. See ECF No. 84. The Court denied this Motion. See ECF No. 90. Then, a few months later, came this request for fees. Lewis's Motion seeks $876,670 in fees for the toil of her three

attorneys and reimbursement of $85,244.41 for the expenses they incurred in this litigation.  See Pl. Mot. at 23.  (As recounted below, Lewis slightly revised these figures in her Reply.)

## II.    Analysis

As is often the case with such quarrels, the parties raise no shortage of disputes.  The main field of battle deals with fees themselves — which requires an analysis of the applicable rate, the number of hours, any adjustment for partial success, and entitlement to fees on fees — after which the Court will also address the issue of costs and expenses.

### A.  Attorney Fees

Under the "American Rule," each party ordinarily bears its own attorney fees.  See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 245 (1975).  This default rule, however, can be altered by express statutory authorization.  Id.  Section 1988 is one such statute.  See 42 U.S.C. § 1988(b).  It provides for an award of a "reasonable attorney's fee" to the "prevailing party" of a suit brought to enforce certain civil-rights laws, including proceedings under 42 U.S.C. § 1983.  The purpose behind this law is intuitive.  It serves to "ensure 'effective access to the judicial process for persons' with civil rights grievances."  Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94-1558, at 1 (1976)).  The awarded fee, accordingly, should be "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case."  Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010).  It should not, however, "produce windfalls to attorneys."  Blum v. Stenson, 465 U.S. 886, 897 (1984).

Defendant here does not dispute that Lewis is a "prevailing party" — at least in part — and thus entitled to some award of fees.  See generally ECF No. 106 (Def. Opp.) at ii–iii (Table of Contents).  The dispute here, rather, turns on the proper sum that the Court should bestow.

The basic framework governing this calculation is well settled.  The Court's analysis rests on a three-part test: "A court must: (1) determine the 'number of hours reasonably expended in litigation'; (2) set the 'reasonable hourly rate'; and (3) use multipliers as 'warranted.'"  Salazar ex rel. Salazar v. District of Columbia, 809 F.3d 58, 61 (D.C. Cir. 2015) (quoting Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015)).  The number arising from the multiplication of the first two prongs of this test is dubbed the "lodestar" amount, which is awarded a presumption of reasonableness.  See Bd. of Trustees of Hotel & Restaurant Emps. Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998).  An upward multiplier is warranted only in "rare" and "exceptional" circumstances, in which compelling factors, not taken into account by the lodestar calculation, require an adjustment to render the fee reasonable.  See Perdue, 559 U.S. at 552–53.

    The fee applicant — here, Lewis — bears the burden at each step of this tripartite calculation.  See Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995).  As Plaintiff does not ask the Court to apply any upward multiplier to the lodestar calculation, the Court's task is clear, but by no means straightforward.  Because much of the parties' fire is concentrated on the applicable hourly rate, that is where the Court begins.  It then turns to the number of hours reasonably expended and the adjustment for less-than-complete success.  Rounding out this section is an analysis of whether Lewis is entitled to reimbursement for the time spent preparing this fees petition, known colloquially as "fees on fees."

    1. *Rate*

    The Court begins with some legal stage-setting.  The determination of a "reasonable hourly rate" itself turns on a three-part test, called the "Covington" factors.  These elements are: "(1) 'the attorneys' billing practices'; (2) 'the attorneys' skills, experience, and reputation'; and (3) 'the prevailing market rates in the relevant community.'"  Salazar, 809 F.3d at 62 (quoting

Covington, 57 F.3d at 1107). The rate does not differ based on whether an attorney is engaged in private or public practice. See Blum, 465 U.S. at 894 ("It is also clear from the legislative history that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization."). In rendering its calculation, the Court is tasked with "fixing the prevailing hourly rate . . . with a fair degree of accuracy." Covington, 57 F.3d at 1109.

In the interest of completeness, the Court will march through each of the three steps in order. As the reader will quickly see, however, the principal site of conflict is the third factor.

### a. Attorneys' Billing Practices

Lewis's attorneys attest that they have no established billing rate. Their cases, they say, come to them on contingency or flat fee. See Pl. Mot. at 16. No matter. Precedent is clear that, in such a circumstance, this factor effectively drops out and the Court looks only to the next two. See Covington, 57 F.3d at 1107 (holding that attorneys with "no established billing practice" are entitled to "award based on the prevailing market rates"). Defendant does not argue otherwise.

### b. Attorneys' Skill, Experience, and Reputation

Moving expeditiously to the next element, the Court has received affidavits documenting the experience of Plaintiff's counsel. Although it briefly runs through each attorney's background, they ultimately play little role here, for Defendant does not challenge these qualifications.

When this case first came in the door, it landed on the desk of Charles Bonner, the senior attorney at the Law Offices of Bonner & Bonner. He handled the initial communication with the District and served as the primary drafter for Lewis's briefs and motions. See Pl. Mot. at 1, 3, 9. Charles Bonner is a seasoned litigator, having been in practice since 1979. See ECF No. 101,

Attach. 1 (Charles Bonner Declaration), ¶ 6.  In his 39 years of experience, he has been the lead attorney in over 75 trials and has litigated and settled over 100 cases in the last five years alone. Id.; Pl. Mot. at 14.

A. Cabral Bonner — the second Bonner in the Law Offices of Bonner & Bonner — assisted Charles Bonner.  His role leading up to trial consisted largely of reviewing and revising the motions drafted by the elder Bonner.  Although newer to the field, Cabral Bonner too has racked up significant litigation experience.  He is a 2006 graduate of Stanford Law School.  See Charles Bonner Decl., ¶ 9; Pl. Mot. at 15.  During his twelve years of practice, he has been involved in fifteen jury trials and argued three times before the Ninth Circuit.  See Charles Bonner Decl., ¶ 9; Pl. Mot. at 15.

As neither Bonner is a member of the D.C. bar, they took on Joseph Scrofano as local counsel when they first filed Lewis's case.  See Pl. Mot. at 3.  A 2008 law graduate of American University, Scrofano founded his own firm in 2011.  See ECF No. 101, Attach. 5 (Joseph Scrofano Declaration), ¶¶ 2–3.  He, too, has trial experience, if less extensive.  Of the approximately 400 civil and criminal cases he has taken on during his ten or so years of practice, Scrofano has tried approximately 20 cases to verdict by a judge or jury.  Id., ¶ 10.

The Court observed the Bonners at length over the course of this litigation.  The multiple days of trial offered a particularly helpful opportunity to evaluate their performance and the fruits of their experience.  The Court believes they operated with a high degree of skill and professionalism.  Although the Court did not have the same opportunity to observe Scrofano, he, too, appears to have performed his lesser duties appropriately.

c. Prevailing Market Rates

It is this third factor — the prevailing market rate — that garners most of the parties'
attention, and that of this Court as well. This is no simple inquiry. See Eley, 793 F.3d at 100
(characterizing the task as "inherently difficult"). To satisfy this prong, the applicant must
"produce satisfactory evidence — in addition to the attorney's own affidavits — that the
requested rates are in line with those prevailing in the community for similar services by lawyers
of reasonably comparable skill, experience and reputation." Id. (quoting Blum, 465 U.S. at 895
n.11)

Luckily, the Court — and, similarly, the fee applicant — need not cast about in the dark
for a prevailing rate. There exists a set of matrices that lays out billing rates for the District of
Columbia. These matrices serve as "one type of evidence" to which a fee applicant can point to
satisfy its burden under this third prong and are commonly a "useful starting point" for the
Court's ultimate determination. Id. (quoting Covington, 57 F.3d at 1109). Courts often,
however, treat these matrices as both the starting point and the last word, simply awarding the
rate set forth in the appropriate matrix. See, e.g., Smith v. District of Columbia, 249 F. Supp. 3d
106, 113 (D.D.C. 2017); Young v. Sarles, 197 F. Supp. 3d 38, 49–50 (D.D.C. 2016); Heller v.
District of Columbia, 832 F. Supp. 2d 32, 48–49 (D.D.C. 2011). The selection of a matrix may
thus matter greatly to the fee applicant. The Court addresses this issue before turning to the other
evidence submitted by Lewis.

i. Applicable Matrix

Two competing matrices are at issue here. One spawned from a set of rates first
established in Laffey v. Nw. Airlines, Inc., 572 F. Supp. 354, 374 (D.D.C. 1983), aff'd in part,
rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984). There, an attorney compiled a list of

rates based on his own experience and conversations with fellow attorneys in the D.C. area.  See

ECF No. 101, Attach. 11 at 18 (Daniel A. Rezneck Declaration), ¶¶ 9, 16.  In 1989, another

attorney — Joseph Yablonski — updated that information, employing a similar approach.  See

ECF No. 101, Attach. 11 at 48 (Joseph A. Yablonski Declaration), ¶ 5.  He also found

consistency between these rates and those published in the National Law Journal.  Id., ¶ 6.

Because rates commanded by attorneys in 1989 would be a poor proxy for the prevailing market

rate today, they are updated to account for inflation.  As an expert witness in 1996, Dr. Michael

Kavanaugh took on this task.  He updated the 1989 base rates using a measure of inflation called

the Legal Services Index (LSI), which is a component of the Consumer Price Index that accounts

for nationwide increases in the cost of legal services.  See ECF No. 101, Attach. 11 at 1 (Michael

Kavanaugh Declaration), ¶ 4.  The resulting matrix, which is further updated each year

proportionate to LSI increases, is appropriately called the "LSI-Laffey Matrix."  (Others courts

sometimes refer to this matrix as the "Salazar Matrix" — named for the case in which

Kavanaugh first applied the LSI to the base rates — or simply the "LSI Matrix.")

Plaintiff urges the Court to adopt this schedule.  See Pl. Mot. at 16.  Doing so would

appear to provide for a rate of $894 an hour for Charles Bonner, $742 an hour for Cabral Bonner,

$658 an hour for Scrofano, and $202 for paralegal time, based on 2018–19 rates.  See

www.laffeymatrix.com/see.html; see also ECF No. 110 (Pl. Reply) at v (pointing the Court to

this source); Charles Bonner Decl., ¶ 28 (noting these rates for both Bonners).  For reasons the

Court cannot discern, however, Lewis's calculation requests $864 for Charles Bonner and $724

for Cabral Bonner, although the requested rates for Scrofano and paralegal time are consistent

with the 2018–19 edition of the Matrix.  See Charles Bonner Decl., ¶ 29; ECF No. 102, Attach. 1

(corrected fee schedule); ECF No. 101, Attach. 2 (original fee schedule containing paralegal hours).

The second matrix, conversely, is maintained and updated by the United States Attorney's Office for the District of Columbia.  Originally, the USAO also utilized the Laffey numbers as the starting point for its matrix but adjusted for inflation based on the all-item Consumer Price Index rather than any legal-services-specific measure.  See Salazar, 809 F.3d at 62.  There is no dearth of courts opining on the relative merits of these two matrices.  See, e.g., id.; Eley, 793 F.3d at 101; Makray v. Perez, 159 F. Supp. 3d 25, 31 (D.D.C. 2016); CREW v. DOJ, 142 F. Supp. 3d 1, 21 (D.D.C. 2015).  In 2015, however, the USAO changed its methodology.  Scrapping Laffey altogether as the baseline, it instead relied on a 2011 survey conducted by ALM Legal Intelligence and called the "Survey of Law Firm Economics" (2011 SLFE).  See ECF No. 106, Attach. 1 (Laura A. Malowane Declaration), ¶ 6; see also EPIC v. U.S. DEA, 266 F. Supp. 3d 162, 171 (D.D.C. 2017) (explaining this shift).  This survey recounts billing rates from attorneys practicing in firms in the "Washington, DC metropolitan area." Malowane Decl., ¶ 6.  From there, the rates are updated each year based on a measure of inflation in the legal market, but one different from the LSI.  The vehicle is a variety of a Producer Price Index (rather than the Consumer Price Index, for which LSI is a component) that tracks pricing changes for a number of legal services.  Id., ¶ 7.  Defendants urge the Court to use this USAO Matrix.  See Def. Opp. at 3.  Based on the newly published 2018–19 rates, this would yield hourly billing rates of $613 for Charles Bonner, $491 for Cabral Bonner, $417 for Scrofano, and $166 for the firm's paralegals.  See www.justice.gov/usao-dc/file/796471.  Quite a difference from the other matrix.

The Court's first task, consequently, is to choose between the matrices. The initial burden to establish an hourly rate lies with the fee applicant, which can then be rebutted with other evidence by the counterparty. See Covington, 57 F.3d at 1109; see also Gatore v. United States, 286 F. Supp. 3d 25, 36–37 (D.D.C. 2017) (establishing this burden-shifting framework and finding that although plaintiff met its burden of establishing prevailing market rate, defendant had sufficiently rebutted plaintiff's evidence). When both parties submit competing matrices, backed up by supporting affidavits and evidence, this framework functionally collapses into one question: Which matrix better reflects the prevailing market rates in the relevant community? Implicit but firmly rooted in this question is an inquiry into the soundness of the methodology used to develop each rate schedule. A more methodologically sound matrix is more likely to reflect the prevailing market rate in the relevant community.

Plaintiff and Defendant have offered dueling expert declarations supporting their preferred matrices. After a careful analysis of these competing declarations, the Court is convinced that the USAO Matrix has the upper hand. This is so largely for the reasons laid out by Defendant's expert, Dr. Laura Malowane, and buttressed by the decisions of other courts that have faced this issue.

First, the USAO Matrix relies on significantly newer data. The baseline survey underlying the USAO Matrix is 22 years more current than that of the LSI-Laffey Matrix. As Malowane explains in her declaration, this difference can have significant effect. Each new edition of the matrix is "estimated," which introduces a "chance of forecasting error," which does not appear to be corrected in later years. See Malowane Decl., ¶ 13. Subsequent editions then use the prior year's estimate as the baseline for the new calculation, thus incorporating that inherent error from each prior matrix. Id. "The more years the matrix continues without

updating its original source," Malowane explains, "the more previous years' forecasting errors may be compounded, and the less reliable the current matrix rates become." Id.; see also Gatore, 286 F. Supp. 3d at 39 (relying on "important[]" fact that USAO Matrix "rates are based on far more current rate data" than the LSI-Laffey Matrix); DL v. District of Columbia, 267 F. Supp. 3d 55, 69 (D.D.C. 2017) (similar). Put another way, the greater the number of years since the baseline, the greater the potential that the adjusted number diverges from the actual prevailing market rate.

Second, the data underlying the USAO Matrix was more reliably collected. The rates rely on a "statistical survey of hundreds of attorneys in the Washington, DC area." Malowane Decl., ¶ 15. The methodology governing its collection used "survey parameters" that "ensured that the data published . . . are reliable." Id.; see also DL, 267 F. Supp. 3d at 69 (relying on superiority of this methodology). The affidavits supporting the LSI-Laffey Matrix reveal no such statistically reliable methodology. In fact, these declarations show a somewhat scattershot collection of attorneys, without any of the methodological protections that ensure a robust sample void of selection bias. See DL, 267 F. Supp. 3d at 69–70 (pointing out deficiency in data collection underlying LSI Matrix). Further, the National Law Journal study that served to confirm Yablonski's rates has been the subject of frequent criticism by courts in this district. Id. at 70 (collecting cases).

Third, the USAO's inflation rate is better calibrated to the legal practices at issue. As a reminder, the USAO Matrix relies on a Producer Price Index for legal services, while the LSI-Laffey Matrix utilizes a Consumer Price Index for legal services. Malowane's description is again instructive. She notes that a consumer index captures "price movements for day-to-day personal legal services that may be used by a typical household," while the PPI employed by the

USAO Matrix measures "pricing changes for services provided by professionals at law firms," which also provide services to corporations or agencies, in addition to consumers. See Malowane Decl., ¶¶ 21–22. This means that the producer index captures "inflationary trends in the most relevant areas of law" — *i.e.*, those most likely to result in similar litigation — which are not reflected in the consumer index. Id., ¶ 21. That may be so, Lewis's expert seems to retort, but these differences have not resulted, at least for the past several years, in dramatically different rates of inflation. See Kavanaugh Decl., ¶ 21 ("The USAO's current measure of price changes . . . is nearly identical to the price change measured by the LSI."). Point taken. Although this factor cuts in favor of the USAO Matrix, it thus does not bear the full weight of the Court's analytical focus.

Fourth, and finally, the USAO Matrix is more finely attuned to measure an attorney's level of experience. While the LSI-Laffey Matrix breaks lawyers into five categories of experience by years out of law school (1–3, 4–7, 8–10, 11–19, and over 20) — in which each year of experience within a category receives the same billing rate — the USAO Matrix uses nine such categories. As Malowane points out, "Survey data indicate that attorney billing rates indeed do go up with each year of experience." Malowane Decl., ¶ 19. The USAO Matrix thus more likely reflects a "prevailing rate[]" for a given attorney's level of "experience." Eley, 793 F.3d at 100–01 (citation omitted).

These considerations — which are for the most part unrebutted by Lewis (more on her objections in a minute) — counsel heavily in favor of using the USAO Matrix. Such a conclusion would place the Court in good company. Not surprisingly, this is not the first court to face the opposed expert opinions of Drs. Malowane and Kavanaugh. The Court counts at least three such prior cases, in all of which Malowane's arguments emerged victorious. See Gatore,

15

286 F. Supp. 3d at 37–40; DL, 267 F. Supp. 3d at 69–70; EPIC, 266 F. Supp. 3d at 170–71.

These decisions thus reinforce this Court's inclination to side with the defense in this battle. To

its knowledge, every court in this district that has evaluated the comparative methodological

soundness of the two matrices, in fact, has favored the USAO Matrix. See Wadelton v. Dep't of

State, No. 13-412, 2018 WL 4705793, at *12 (D.D.C. Sept. 30, 2018); Gatore, 286 F. Supp. 3d at

45; NSC v. CIA, No. 11-444, 2017 WL 5633091, at *19 (D.D.C. Nov. 21, 2017); DL, 267 F.

Supp. 3d at 69; EPIC, 266 F. Supp. 3d at 171; Clemente v. FBI, No. 08-1252, 2017 WL

3669617, at *5 (D.D.C. Mar. 24, 2017); cf. Westfahl v. District of Columbia, 183 F. Supp. 3d 91,

98 (D.D.C. 2016) (stating that "[t]he new USAO matrix may well offer a preferable approach,"

but deciding not to apply it because defendant "has not provided the Court with any evidentiary

basis to reach that conclusion").

Conversely, many of the decisions that adopted the LSI-Laffey rates over the now-

defunct USAO-Laffey rates — i.e., the pre-2015 USAO Matrix — relied on factors that now

favor the new USAO Matrix. Most prominently, prior courts faulted the USAO Matrix because

it used a measure of inflation that was poorly matched to legal services. See, e.g., CREW v. U.S.

DOJ, 80 F. Supp. 3d 1, 3 (D.D.C. 2015); Smith v. District of Columbia, 466 F. Supp. 2d 151,

156 (D.D.C. 2006); Salazar v. District of Columbia, 123 F. Supp. 2d 8, 14–15 (D.D.C. 2000); see

also Jones v. District of Columbia, 153 F. Supp. 3d 114, 128 n.12 (D.D.C. 2015) (collecting

cases). The tables have now turned. As explained earlier, it is the USAO Matrix that now

employs the more relevant measure of inflation. Similarly, courts — including this one —

faulted the USAO Matrix because its 1983 base rates were older than the 1989 base rates in the

LSI index. See CREW v. U.S. DOJ, No. 11-1021, ECF No. 66 (D.D.C. Oct. 24, 2014) ("The

LSI Matrix has the advantage of being based on more recent data than the CPI Matrix."). This

factor, too, now cuts in the other direction.  The logic of these cases now appears to favor the

new USAO Matrix.  Cf. Clemente, 2017 WL 5633091, at *19 (holding that LSI Matrix rates

were superior prior to update of USAO Matrix, but USAO Matrix was superior to LSI Matrix

post-update).

This same rationale fells Lewis's suggestion that the "D.C. Circuit has . . . endorsed the

LSI Matrix."  Pl. Mot. at 17.  Although that court has previously affirmed a trial court's decision

to apply that matrix in a Section 1988 case, see Salazar, 809 F.3d at 60–61, that case — like the

ones mentioned above — predates the new USAO Matrix.  In Salazar, the district court had

rested its decision in part on the relative superiority of the LSI-Laffey Matrix over the now-

outdated USAO-Laffey Matrix, which served as a key component of the Circuit's affirmance.

Id. at 64–65.  The advent of the new USAO Matrix removed that pillar of the decision.  In any

event, a reader need but glance at Salazar to see that its holding does not control here, and Lewis

does not make a full-throated argument that it does.  The D.C. Circuit only held that the district

court had not abused its discretion in awarding LSI-Laffey rates based on the evidence submitted

by the parties.  Id.  The Circuit relied on its observation that the plaintiff had submitted a "great

deal of evidence" that the defendant had failed to "rebut[] . . . with relevant arguments."  Id. at

64–65.  Nowhere did the court mandate that LSI-Laffey rates must be awarded in section 1988

cases.  For these reasons, other courts in this district have similarly found that Salazar does not

dictate the outcome in a case such as this one.  See Gatore, 286 F. Supp. 3d at 43–44; DL, 267 F.

Supp. 3d at 71; EPIC, 266 F. Supp. 3d at 171; Wadelton, 2018 WL 4705793, at *11.

Hold up, says Lewis: this may all be true, but the USAO Matrix suffers from its own

deficiencies.  Her primary beef is that the USAO Matrix reflects all types of legal services, not

just what she describes as "complex federal litigation."  The LSI index, on the other hand, she

attests, is focused on such litigation. See Pl. Reply at 3–8. Plaintiff ultimately does not present all the pieces necessary to complete this puzzle. Even if the Court were to grant her premise, Lewis's argument can, at most, amount to one factor favoring the application of her desired matrix, which must still be weighed against the countervailing considerations that favor the methodological superiority of the USAO Matrix. The Court has little trouble concluding that the USAO Matrix emerges victorious from this contest. And it is not clear why, if a methodologically superior measure of market rates is an appropriate "starting point" for most cases, complex ones must begin with a less accurate model. See Eley, 793 F.3d at 100 (quoting Covington, 57 F.3d at 1109); see also CREW, No. 11-1021, ECF No. 66, at *17 (stating similar rationale).

Plaintiff still has one more arrow in her quiver. She takes issue with the fact that the 2011 SLFE — which, as a reminder to readers, is the survey that underlies the USAO Matrix — draws from attorneys in the D.C. metropolitan area who are not, in fact, located within the District — namely, practitioners across the border in Maryland and Virginia. See Pl. Reply at 2–3. Here, again, Lewis has not carried her burden. She must do more than simply assert that the "relevant community," Salazar, 809 F.3d at 62, is limited to D.C. and forecloses our brother and sister counsel a few miles away across the District line. Her conclusory assertion that the District is a "distinct legal market" does not cut it. See Pl. Reply at 3.

Approaching from a different direction, Plaintiff contends that courts have declined to award D.C. rates to attorneys appearing in Virginia courts. Id. As an initial matter, Lewis leaves out a key detail from those cases. In both cases to which she points, the courts grounded their conclusion on the fact that the plaintiffs "provided no evidence" to support their desired equivalence. See Robinson v. Equifax Information Servs., LLC, 560 F.3d 235, 245 (4th Cir.

2009); Grissom v. The Mills Corp., 549 F.3d 313, 323 (4th Cir. 2008). Setting aside this point, Lewis's argument suffers from a more fundamental flaw. She draws from the premise that a lawyer in a Virginia case is not entitled to D.C. rates the conclusion that the "relevant community" for a D.C. case cannot include Virginia lawyers. But there is a plethora of reasons why that conclusion is not a corollary of the premise. Perhaps it is common, for example, for lawyers in the D.C. suburbs to practice in the city, but less common for the reverse to occur. Focusing thus on the appropriate question, there can be little doubt that attorneys with offices in close-in Virginia and Maryland communities — that are easily within the "D.C. Metropolitan area" — often practice in this district and should thus be included in the analysis of prevailing rates. Plaintiff must do more to establish otherwise.

           ii.      Non-Matrix Evidence

Lewis also submits a host of affidavits attesting to her counsel's competence. Although helpful in understanding their qualifications, these do not get far in establishing the applicable market rate. Of the three declarants who take up this task for the Bonners (Burris, Moore, and Edwards), none currently practices in the District of Columbia. See Pl. Mot. at 18–20. Their pronouncements that the Bonners are entitled to the LSI-Laffey Rate — a matrix unique to the District — accordingly carry little weight. Two attorneys do state their position on personal experience that Scrofano should receive LSI rates (Claiborne and Kalpraith). Id. at 20–22. But given the lack of other supporting evidence, this evidence is insufficient to carry the burden.

Perhaps sensing this conclusion, Lewis changes tack in her Reply brief. She eschews any reliance on the LSI-Laffey Matrix and instead asks the Court to award rates derived from the 2011 SLFE survey, but with at least two differences from the methodology that yields the USAO Matrix. Plaintiff first takes another shot at asking the Court to limit the practitioner base to those

19

practicing within D.C. limits and, second, requests that all three attorneys be awarded at either the top quartile or ninth decile of attorneys' rates.  See Pl. Reply at 11–15.  Lewis also submits additional data and surveys not included in her original petition.  See ECF No. 110, Atts. 2 (rate comparison chart), 4 (Valeo rates).

As an initial matter, the Court has reservations about the timing of this new approach.  In general, arguments made for the first time in a reply brief are forfeited.  See Nakai v. Zinke, 279 F. Supp. 3d 38, 45 (D.D.C. 2017); Conservation Force v. Jewell, 160 F. Supp. 3d 194, 204–05 n.4 (D.D.C. 2016) ("[N]ew arguments made in a reply brief are forfeited.").  When a party belatedly raises an issue, the Court is deprived of a key element of the adversarial process necessary to ensure a correct decision.  This principle applies with particular force in a fact-bound circumstance such as this one, when the non-movant is entitled to offer rebuttal evidence. See Covington, 57 F.3d at 1109.

Even if the Court were to address these arguments on the merits, it would not be persuaded.  Plaintiff's request for the top quartile (or ninth decile) of rates reported in the 2011 SLFE appears to be an attempt to locate a more-specific rate appropriate for complex federal litigation.  But beyond a brief wave to another survey from a different case, see Pl. Reply at 13, Lewis offers no support for this equivalence.  Nor does she provide any other reason that top-tier rates, as opposed to the average rates employed by the USAO Matrix, are appropriate.  The Court has little trouble concluding that such perfunctory statements are incapable of carrying Plaintiff's burden.  Similarly, for the reasons discussed above, it is unconvinced that she has shown that the strict lines of the District are the appropriate legal community, rather than those generally practicing in this metropolitan area.

iii.    Entry Year

Having determined that the USAO Matrix provides the appropriate rate to reimburse

Lewis's attorneys, there arises a follow-on question: what entry year of the Matrix should the

Court use?  Lewis's attorneys engaged in work over the course of many years, and Defendants

thus urge the Court to use the applicable Matrix for each year.  See Def. Opp. at 18.  No good,

retorts Plaintiff: her attorneys should be compensated for having to wait until now to receive

their money.  Providing for fees based on current rates, she says, is a modest way of doing that.

See Pl. Reply at 16.

Plaintiff has the better argument.  The Supreme Court has made clear that prevailing

attorneys in section 1988 cases may be entitled to some compensation for the often-years-long

delay in payment.  See Missouri v. Jenkins ex rel. Agyei, 491 U.S. 274, 282–83 (1989).  This

delay can "deprive[] the eventual recipient of the value of the use of the money in the

meantime," which can be valuable."  West v. Potter, 717 F.3d 1030, 1034 (D.C. Cir. 2013)

(quoting Copeland v. Marshall, 641 F.2d 880, 893 (D.C. Cir. 1980)).  To compensate, two routes

are available.  The adjustment proceeds "either by basing the award on current rates or by

adjusting the fee based on historical rates to reflect its present value."  Perdue, 559 U.S. at 556

(quoting Jenkins ex rel. Agyei, 491 U.S. at 282).  Given the difficulty in calculating the true

present value of past rates, courts in this district — including this one — have often opted for the

former approach.  See, e.g., Ashraf-Hassan v. Embassy of Fr. in the U.S., 189 F. Supp. 3d 48, 58

(D.D.C. 2016); DL, 267 F. Supp. 3d at 73.

The Court concludes that some compensation is warranted here and that applying the

rates from the current year is the preferable approach.  This is so, in part, because of its

simplicity.  Although this method is by no means perfect, that is not the goal.  "The essential

goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." <u>Fox v. Vice</u>, 563 U.S. 826, 838 (2011).

This rationale does not, however, justify awarding rates based on the level of experience the attorneys have now, as opposed to their experience at the time. <u>See</u> <u>Young v. Sarles</u>, 197 F. Supp. 3d 38, 51–52 (D.D.C. 2016) (providing for reimbursement rates based on experience at time of billing). The Court, therefore, will use the current USAO Matrix but will apply the experience level at the time of billing.

### 2. *Hours Reasonably Expended*

Now that it has the rate, the Court needs the other component of the lodestar figure — *i.e.*, the number of hours. Plaintiff bears the burden here, too. <u>See</u> <u>Covington</u>, 57 F.3d at 1107. As the first step in satisfying it, a party requesting fees must produce "supporting documentation . . . of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." <u>Role Models Am., Inc. v. Brownlee</u>, 353 F.3d 962, 970 (D.C. Cir. 2004) (internal quotation marks and citation omitted); <u>see also</u> <u>Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.</u>, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (requiring "contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney"). In so doing, it must exercise its "billing judgment" and exclude from its request hours that "are excessive, redundant, or otherwise unnecessary." <u>Hensley</u>, 461 U.S. at 434. Along these lines, the Supreme Court has instructed courts to take up this mantle when the party fails to do so and "exclude from [the] fee calculation hours that were not 'reasonably expended.'" <u>Id.</u> (quoting S. Rep. No. 94-1011, at 6 (1976)). District courts have "wide discretion to reduce individual fee entries." <u>Nat'l Venture Capital Ass'n v. Nielson</u>, 318 F. Supp. 3d 145, 152 (D.D.C. 2018) (citation omitted).

Along a different axis, a party may be entitled to a reduced award if its victory is incomplete. "A plaintiff's overall success on the merits also must be considered in determining the reasonableness of a fee award." Judicial Watch, Inc. v. U.S. Dep't of Commerce, 470 F.3d 363, 369 (D.C. Cir. 2006); see also Hensley, 461 U.S. at 436 (stating that "most critical factor" in determination of reasonable fee is "the degree of success obtained"). Here, too, the Court is afforded discretion to "identify specific hours that should be eliminated" or, alternatively, "simply reduce the award to account for the limited success." Hensley, 461 U.S. at 436.

The District mounts a series of attacks along multiple fronts. Before arbitrating these skirmishes, the Court offers a global note on its approach. Its task is not to become a "green-eyeshade accountant[,]" sequentially weighing the propriety of each entry listed in the movant's request. See Fox, 563 U.S. at 838. The goal here is "rough justice," rather than engaging in hand-to-hand combat that is itself a "'second major litigation.'" Id. (quoting Hensley, 461 U.S. at 437). Defendant appears to have lost sight of this objective. While some of its grievances are no doubt warranted, others can only be characterized as quibbles, unnecessarily escalating this step of the litigation. An example: The District asks the Court to remove hours corresponding to some two dozen or so entries that refer to correspondence with "CL," which Defendant thinks "might be shorthand for 'client,'" but cannot be sure. See Def. Opp. at 32. In its Reply, Plaintiff confirms it: "CL" indeed means "client." See Pl. Reply at 27. This is not the type of dispute that the Court hoped to see in this briefing. In accord with the Supreme Court's directive in Fox, 563 U.S. at 838, it will, once again, decline "to engage in the kind of 'nitpicking' invited by" the District's "smaller-scale objections." Am. Immigration Council v. U.S. Dep't of Homeland Sec., 82 F. Supp. 3d 396, 411 (D.D.C. 2015); accord Coffey v. Bureau of Land Mgmt., 316 F. Supp. 3d 168, 171 (D.D.C. 2018).

So as not to leave the reader lost along a seemingly endless path, here is a quick map of the following section. The Court begins with the District's general argument regarding billing judgment, before moving to the allegation of excessive hours and insufficiently detailed entries. Within these categories, only one of the District's arguments ultimately finds success: its contention that the full number of hours billed by Scrofano — the Bonners' local counsel — is not reasonable. The Court then addresses Lewis's overall success on the merits, finding only a limited reduction in the number of hours to be warranted, before concluding with the compounded issue of fees attributable to this Motion.

### a. Billing Judgment

Defendant first dispatches a general broadside at Lewis's hours request, accusing her attorneys of generally exercising poor "billing judgment." See Def. Opp. at 24. Plaintiff parries this one easily. Although the District claims that she has failed to "provid[e] the Court with [a] way to conclude that only productive time was included," Def. Opp. at 24, that is not the case. All attorneys submitted extensive documentation of their time, accompanied by both individual entries detailing their discrete tasks and declarations providing the Court with an overview of their work. See ECF No. 102, Attach. 1 (time entries for Charles Bonner and Cabral Bonner); Charles Bonner Decl., ¶¶ 22–27; ECF No. 101, Attach. 5 (Declaration and time entries for Joseph Scrofano). After reviewing these entries and supporting documentation, the Court has confidence in the general billing judgment demonstrated by these attorneys.

Each attorney further exercised judgment by removing various time entries from his request. The District characterizes these reductions as "haphazard and insufficient." See Def. Opp. at 24. It does not, however, flesh out why it thinks such criticism is warranted. And the Court's independent review has revealed no support. Both Charles Bonner's and Scrofano's

declarations sufficiently explain the logic for the elimination of time entries from the fee Motion.  <u>See</u> Charles Bonner Decl., ¶ 23, Scrofano Decl., ¶ 16; <u>see also</u> Pl. Mot. at 11 (explaining the reduction); Pl. Reply at 28 (similar).  The Court's inspection of the time entries, confirmed by its own familiarity with this lawsuit, yields the conclusion that the deletions are reasonable and consistent with the exercise of billing judgment.

      b.   Excessive Hours

Perhaps as a more targeted variation of its first attack, the District next contends that the hours devoted to certain tasks were either excessive, redundant, or too simple to justify an attorney's time.  <u>See</u> Def. Opp. at 27–32, 33–35.

In one respect, the Court agrees.  The complexity of this case does not justify awarding a full fee for all the hours that Scrofano spent at trial.  <u>See</u> Def. Opp. at 33–34.  This finding should not come as news to either party.  During trial, this Court remarked that "this case didn't need three lawyers," a sentiment it continues to hold today.  <u>See</u> ECF No. 97 (03/16/2018 PM Trial Transcript) at 70:8–9.  Overstaffing or duplication of efforts is a prototypical reason to reduce a fee award.  <u>See</u> <u>Hensley</u>, 461 U.S. at 434 (listing that "[c]ases may be overstaffed" as reason that courts should "exclude from this . . . fee calculation hours that were not reasonably expended"); <u>Role Models</u>, 353 F.3d at 972 ("Duplication of effort is another basis on which [the] hours seem excessive.") (citation omitted); <u>EPIC v. Dep't of Homeland Sec.</u>, 197 F. Supp. 3d 290, 296 (D.D.C. 2016) ("Surveying the bill, the Court locates the main culprit: overstaffing.").  Lewis retorts that the local rules required the Bonners — neither of whom is barred in D.C. — to obtain local counsel.  <u>See</u> Pl. Reply at 24.  That is certainly true.  It does not justify, however, a full fee award for an otherwise unnecessary third attorney to sit through days of trial billed at a full rate.

Perhaps anticipating this conclusion, Lewis asserts that Scrofano's "involvement was critical to success at the trial level."  Pl. Mot. at 3; <u>see also</u> <u>id.</u> at 10 (similar).  Plaintiff draws

support for this assertion from two sources. First, Charles Bonner states in his declaration that Scrofano's preparation of the pain-and-suffering witnesses — which occurred outside of the hours spent actually in trial — allowed the other two attorneys to prepare for opening and closing arguments. See Charles Bonner Decl., ¶ 21; Pl. Mot. at 10. That makes sense. The Court will thus award full hours to Scrofano for the corresponding entry on this timesheet. Again, however, it does not justify awarding full fees for the hours Scrofano spent at counsel table. Second, Charles Bonner relies on his assertion that his firm "had limited support staff to assist during trial." See Charles Bonner Decl., ¶ 21; Pl. Mot. at 5. It should come as no surprise that the professed need for administrative staff does not lead the Court to conclude that it should allow Plaintiff to recover those hours at the rate of an attorney with 8–10 years' experience.

Here is what seems fair: While Scrofano's involvement as local counsel was necessary, the Court concludes that it does not warrant awarding fees for the presence of a third lawyer at each day of trial. The Court, accordingly, will discount by 75% Scrofano's trial hours, but will leave all else intact. It will not, therefore, discount hours spent on the focus group, the preparation of witnesses, or *pro hac vice* motions.

The District's remaining quibbles with the requested hours do not fare as well. It starts with a charge that the time spent on a number of individual tasks was excessive. See Def. Opp. at 27–29. Whether hours spent are excessive is clearly a matter of judgment, and in the Court's view, this one is easy. A couple of examples again suffice. The District takes issue with the Bonners' billing 6 hours for a settlement conference that lasted only 4 hours. See id. at 27. As Plaintiff points out, however, both attorneys met with their client both before and after the conference. See Pl. Reply at 22; ECF No. 110, Attach. 1 (Charles Bonner Reply Declaration), ¶ 5. Not only are such meetings reasonable, they should have been entirely foreseeable to the

District.  Similarly, the District takes issue with various 0.1 hour increments — *i.e.*, 6 minutes, generally the smallest used — to review documents.  <u>See</u> Def. Opp. at 28.  Not only is it reasonable to bill for such time, both Bonners heavily discounted many of these entries.

Along similar lines, there is little merit to be found in the District's charge that the fee applications billed "more hours than an attorney can reasonably bill in a day" both in preparation for and during trial.  <u>See</u> Def. Opp. at 30.  The Court is a bit perplexed by this objection.  Charles and Cabral Bonner billed about 14 hours on these days.  "Trial days are long," they say, and promise that they did in fact work those hours.  <u>See</u> Pl. Reply at 23.  If the District means to say that billing that number of hours in a day is impossible, the Court need not dally on that argument.  After all, billing a 14-hour day could likely be accomplished by waking at 7:00 a.m. and working through the day until 11:00 p.m., using 2 hours for non-billable activities.  Arduous certainly, but not Herculean.  If the District instead means that the Bonners put in more hours than they should have, it fares no better.  Contrary to the Defendant's contention, it does not defy this Court's belief that attorneys preparing and trying a case such as this, who were lodging and working away from home, would appropriately work days this long.  Litigation is demanding.

The District's remaining gripes about the few other entries listed fall by the wayside for the same reason.  The Court has looked over all records and — apart from the exception noted above — discerns no general excessiveness.   Nor does the District's charge that some clerical tasks should be excluded or billed at a paralegal rate stick.  <u>See</u> Def. Opp. at 34.  Without venturing into the green-eyeshade territory the Supreme Court has instructed trial courts to avoid, the Court is satisfied here that the billing entries do not suffer from a general deficiency.  <u>See</u> <u>Fox</u>, 563 U.S. at 838.

c. Insufficiently Detailed Entries

Undeterred, the District next takes aim at the manner in which Plaintiff's attorneys recorded their time. It lobs two challenges in this respect, both of which concern the Court's ability to evaluate the reasonableness of the attorneys' billed time: block billing and impermissible vagueness. See Def. Opp. at 25–27, 32–33.

Problematic block billing can occur when multiple unrelated tasks are billed together so that a reader "cannot know the nature of the services for which compensation is sought." Copeland, 641 F.2d at 891 (citation omitted); see also Role Models, 353 F.3d at 971 (stating that a lawyer should not "lump together multiple tasks" when billing because this practice "mak[es] it impossible to evaluate their reasonableness"). This practice can interfere with the Court's task when the nature of the attorneys' entry "frustrates the Court's ability to separate time spent on successful and unsuccessful claims and to award fees accordingly." Hernandez v. Chipotle Mexican Grill, Inc., 257 F. Supp. 3d 100, 111 (D.D.C. 2017). That is not a problem, however, with the half-dozen examples to which the District points. One will suffice to show the point. The District objects that on April 13, 2015, Cabral Bonner billed 2.5 hours to "download and review new trial motion, search local rules and Federal rules regarding time to oppose, review MSJ order for law, draft email re opposition." Def. Opp. at 26. It makes eminent sense, however, that the junior partner on the litigation team would spend 2.5 hours to perform all of these tasks sequentially because they all relate to the same litigation event — the filing of a new-trial motion — and that a single billing entry would record them. See Copeland, 641 F.2d at 891 (requiring only "fairly definite information" on "general activities") (citation omitted). The vast majority of the manner of the attorneys' entries does not leave the Court with any deficit in its

ability to discern "with a high degree of certainty" the relevant category of work for which the attorney is requesting compensation. See Role Models, 353 F.3d at 970 (citation omitted).

The District's charge of impermissible vagueness meets the same fate. See Def. Opp. at 32. There is no requirement to "present the exact number of minutes spent nor the precise activity to which each hour was devoted." Cobell v. Norton, 231 F. Supp. 2d 295, 306 (D.D.C. 2002) (quoting Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1327). Considering a charge of vagueness, this Court has previously stated that "no more is necessary than 'fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations.'" Nat'l Venture Capital Ass'n, 318 F. Supp. 3d at 153 (quoting Jordan v. DOJ, 691 F.2d 514, 520 (D.C. Cir. 1982)). This Lewis has done. The Court has perused all the records and, on net, has had no trouble figuring out the tasks to which Plaintiff refers. As it has said in another case, its "survey of Plaintiff's billing entries reflects . . . that the vast majority are appropriately detailed." Am. Immigration Council v. U.S. Dep't of Homeland Sec., 82 F. Supp. 3d 396, 412 (D.D.C. 2015). "No reduction is warranted to account for a handful of entries that could have perhaps benefitted from slightly more detail." Id.

Descending to a new level of granularity, the District takes issue with some billing entries for which the fee applicants used quarter-hour, instead of tenth-hour, increments. See Def. Opp. at 36. It argues billing by the quarter hour "is a deficient practice because it does not reasonably reflect the number of hours actually worked." Id. at 36 (citation omitted). It is true that some courts have reduced attorney hours when billed entirely in quarter-hour increments. See, e.g., Lopez v. S.F. Unified Sch. Dist., 385 F. Supp. 2d 982, 993 (N.D. Cal. 2005). But this approach is not uniform. Other courts have permitted this billing practice but cautioned against it. See, e.g., ACLU v. U.S. Dep't of Homeland Sec., 810 F. Supp. 2d 267, 279 (D.D.C. 2011); A.C. v. District of Columbia, 674 F. Supp. 2d 149, 157 (D.D.C. 2009).

Still others permit it entirely. See, e.g., United Brotherhood of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Mason's Int'l Ass'n, AFL-CIO, No. 09-2212, 2014 WL 1279240, at *5 (D.D.C. Jan. 10, 2014); Rooths v. District of Columbia, 802 F. Supp. 2d 56, 64 (D.D.C. 2011); Does I, II, III v. District of Columbia, 448 F. Supp. 2d 137, 142 (D.D.C. 2006).

Although the Court agrees that a practice of billing generally in quarter-hour increments may sacrifice some accuracy (whether that sacrifice warrants a reduction is another question), that is not the case here. The Bonners generally billed in tenth-hour steps and only occasionally switched over to the larger increment. As the District calculates, about 27% of Cabral Bonner's entries and a measly 2% or so of Charles Bonner's entries are definitively billed by the quarter hour. See Def. Opp. at 36. Under these facts, the District's argument, and the logic supporting it, breaks down. For while it may reduce accuracy to generally round to the nearest quarter hour, occasionally deviating from tenth-hour to quarter-hour increments has the potential, conversely, to more accurately reflect the amount of work done. Consider an attorney who spends exactly 15 minutes on a task. While a quarter-hour entry permits the precise recordation of this work, a tenth-hour increment — i.e., 12 or 18 minutes — necessarily introduces some error. The Court can thus set aside the question of whether generally billing in quarter-hour increments is appropriate. It sees no reason — nor has the District provided one — why a decrease makes sense when only a relatively small number of entries are billed that way.

### d. Success on the Merits

Turning away from quibbles with billing entries, the District finds more success. It contends that Lewis obtained a less-than-complete victory that warrants a reduction in fees. See Def. Opp. at 20–23. If the District's premise is right, that conclusion follows: "[T]he extent of a

plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees." Hensley, 461 U.S. at 440.

Turning to the facts at hand, there can be little doubt that the jury's verdict constitutes a significant success for Lewis. By finding a Fourth Amendment violation, the jury vindicated her primary grievance and awarded her a substantial monetary sum. It is also clear, however, that Plaintiff did not prevail on every claim she brought. Her original suit composed of eleven separate claims against five named Defendants ultimately yielded a victory on one cause of action against a single Defendant. A well-established framework guides the Court's determination of whether a success-on-the-merits reduction is appropriate in such a situation.

Hensley is the foundational case. There, the Supreme Court instructed that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." Id. The D.C. Circuit has interpreted Hensley to establish a two-step inquiry: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" George Hyman Const. Co. v. Brooks, 963 F.2d 1532, 1535 (D.C. Cir. 1992). "In assessing the fees for related claims," however, "'a court is to skip the first Hensley inquiry and move to its second.'" Goos v. Nat'l Ass'n of Realtors, 997 F.2d 1565, 1569 (D.C. Cir. 1993) (quoting Brooks, 963 F.2d at 1537). Put another way, "if successful and unsuccessful claims share a common core of facts[,] . . . a court should simply compute the appropriate fee as a function of degree of success." Id. (citation omitted); see also EPIC, 197 F. Supp. 3d at 296 ("[E]ven where there is a 'core base of facts' underlying the issues, the Court may still exclude fees on an issue-by-issue basis when each issue has a 'unique legal basis.'") (quoting Nat'l Sec. Archive v. U.S.

Dep't of Def., 530 F. Supp. 2d 198, 204 (D.D.C. 2008)). The second inquiry requires "the factfinder [to] then consider whether the success obtained on the remaining claims is proportional to the efforts expended by counsel." Brooks, 963 F.2d at 1535.

Turning now to the parties' arguments, the District contends that Lewis's "surfeit of unsuccessful claims and improper defendants" merits a reduction in fees. See Def. Opp. at 22. It contends that Plaintiff's damages award does not represent "overall success" because she "clearly sought damages for the failed claims as well." Id. Plus, the District says, it should not be liable for fees incurred in prosecuting claims against other Defendants, especially when those claims were not successful. Id.

Lewis disagrees. Her claims, she posits, all arise from a common core of facts — namely, her termination — and simply constitute alternative legal theories for relief, the success of which entitles her to a fully compensatory award. See Pl. Reply at 17–20. Perhaps realizing that some deduction is warranted, however, Lewis points out that she has "already made reasonable deductions" to her attorneys' time spent prior to the Court's resolution of Defendants' Rule 12(b)(6) Motion. See id. at 19; Pl. Mot. at 11.

The Court ultimately finds merit in both parties' arguments. There can be little doubt that, as Lewis proclaims, the counts in her Complaint were interrelated. In fact, the Court dismissed some of her claims precisely on this basis, finding some duplicative of others. See Lewis, 161 F. Supp. 3d at 36. Even if the factual bases differ in some ways, they are not "'distinctly different' in all respects, both legal and factual." Williams v. First Gov't Mortg. & Invests. Corp., 225 F.3d 738, 746 (D.C. Cir. 2000) (quoting Morgan v. District of Columbia, 824 F.2d 1049, 1066 (D.C. Cir. 1987)). All involved the circumstances surrounding her termination. For this reason — and aided by the fact that most unsuccessful claims were dismissed early on in

this saga — it would be nearly impossible for the Court to "divide the hours expended on a claim-by-claim basis." Craig v. District of Columbia, 197 F. Supp. 3d 268, 283 (D.D.C. 2016) (citation omitted). Because her claims are related, the Court focuses its attention on the second prong. See Goos, 997 F.2d at 1569.

Here, however, the District has a point. This Court, like others in this district, will consider Lewis's success at successive stages of the litigation. See, e.g., Radtke v. Caschetta, 254 F. Supp. 3d 163, 171 (D.D.C. 2017); Craig, 197 F. Supp. 3d at 284 & n.7. In its Rule 12(b)(6) ruling, the Court significantly narrowed the scope of Lewis's Complaint. It trimmed the initial Complaint from something that contained "any conceivable claim" into one that contained claims that would survive to trial. See Lewis, 161 F. Supp. 3d at 23. Many of the dismissed claims were sufficiently distinct to warrant some reduction. The tort claims, for example, were not only built on a wholly different legal foundation, but also rested on facts largely different from those of Lewis's Fourth Amendment claim and accordingly offered separate relief. The Court, therefore, will apply a 50% haircut to Charles and Cabral Bonner's hours up until the ruling on the second motion to dismiss, on December 9, 2015. Given the wide variety of claims that were dismissed, the Court finds that such a reduction is necessary to ensure that the "success obtained on the remaining claims is proportional to the efforts expended by counsel." Brooks, 963 F.2d at 1535. Because Scrofano's billing entries reveal limited involvement with the substance of the Complaint and these motions, the Court will not touch his pre-Rule 12(b)(6) hours, nor will it trim paralegal hours.

The Court finds that Plaintiff is entitled to all hours after these motions. Although Lewis "failed to prevail on every [remaining] contention," Hensley, 461 U.S. at 435, the Court sees a close correlation between her attorneys' efforts and her overall success. Said otherwise, the

Court does not think that her attorneys would have expended significantly more hours had she prevailed on all the remaining counts or, alternatively, put in fewer if she had proceeded along with only the Fourth Amendment count against the District. In such situations, no reduction is warranted. Id. ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.").

One quick note on the implementation of this finding: Plaintiff's attorneys have reasonably already reduced some of this time, and this cut should not be doubly applied. In rendering its calculation, the Court will therefore first add back in the hours deducted before implementing its percentage cut.

There is one more issue to resolve regarding Lewis's success in litigation. The District also contends that she should not obtain fees related to any efforts toward settlement because these discussions did not ultimately bear fruit. See Def. Opp. at 23. The Court disagrees. As another court in this district recently espoused, "[A]bsent any indication that the District had completely declined to engage in settlement efforts and plaintiffs knowingly billed for settlement time anyway, plaintiffs should be compensated for time spent on settlement efforts." DL, 267 F. Supp. 3d at 76. This Court agrees. It also thinks that adopting the District's strict view would have perverse effects on the incentives of parties to engage in good-faith settlement negotiations.

e. Fees on Fees

Closing in on the end, Lewis next seeks an award of attorney fees for the time expended in briefing this Motion for fees. Such a request is appropriately dubbed as one for "fees on fees." See, e.g., EPIC, 197 F. Supp. 3d at 294–95. Courts in this district have concluded that awards of "fees on fees" should be reduced to exclude the amount of time spent unsuccessfully defending

fee requests denied by the court.  See, e.g., Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veterans Affairs, 1999 WL 33740260, at *5–6 (D.D.C. 1999); see also Commissioner, INS v. Jean, 496 U.S. 154, 163 n.10 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation.").  "Where a lawsuit consists of related claims," however, "a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." Hensley, 461 U.S. at 440.

The appropriate rate applied to Lewis's attorneys constituted a focal point of this fees Motion.  On this question, Plaintiff did not prevail.  Although Lewis did win almost every challenge to her counsel's expended hours, here, too, her success was incomplete.  The Court, accordingly, will follow the lead of other courts in this district and will award Lewis the same "percentage of fees for fee litigation as it does for fees on the merits."  EPIC v. Dep't of Homeland Sec., 982 F. Supp. 2d 56, 61 (D.D.C. 2013); Judicial Watch, 878 F. Supp. 2d at 241 (reducing requested fees-on-fees award in same ratio as reduction of award for litigation of case). This approach ends up being functionally similar to ratably reducing the number of hours Lewis's counsel spent on this Motion then multiplying that sum by the applicable USAO Matrix rates.

On the merits (i.e., excluding hours attributable to this fees Motion), Lewis requested for Charles Bonner 504.8 hours at a rate of $864 yielding $436,155.80; for Cabral Bonner 430.3 hours at a rate of $724 yielding $311,537.20; for Scrofano 63.3 hours at a rate of $658 yielding $41,651.40; and for paralegal time 165.85 at a rate of $202 yielding $33,501.70.  These figures sum to a total merits fees request of $822,846.10.  As Table 1 below indicates, the Court will

award a total of $556,122.18 for this work, representing a 32% reduction from the requested figure.  The Court will reduce the fees-on-fees requests by the same proportion.

B.  Costs and Expenses

Finally rounding third base and coming home, only one issue remains: Lewis's request for expenses.  Plaintiff initially requested some $85,000 in this category, although she cut this figure a bit in her Reply.  See Pl. Mot. at 22–23; Pl. Reply at 29.

Section 1988 entitles a prevailing party to reasonable expenses.  See Heller v. District of Columbia, 832 F. Supp. 2d 32, 60 (D.D.C. 2011); Smith v. District of Columbia, 466 F. Supp. 2d 151, 161 (D.D.C. 2006).  Caselaw articulating the contours of reasonable expenses is a bit of a smorgasbord.  The Circuit has held that some discrete classes of expenses are categorically barred.  These include messenger services, ground transportation, and overtime services.  See Role Models, 353 F.3d at 974.  Expert fees meet the same fate.  See Harvey, 951 F. Supp. 2d at 73–74.  On the other hand, "[d]istrict courts in our circuit have allowed recovery under § 1988 for postage, long-distance telephone service, photocopying, and computer-assisted legal research."  Id. at 69.  Some travel expenses are similarly reimbursable.  See Campbell v. District of Columbia, 202 F. Supp. 3d 121, 137 (D.D.C. 2016).  And although costs enumerated in 28 U.S.C. § 1920 — which provides a list of items for which a "judge . . . of any court of the United States may tax as costs" — are generally reimbursable, see Harvey, 951 F. Supp. 2d at 72, the "D.C. Circuit has also held . . . that costs under § 1988 are not limited" to this list.  See Campbell, 202 F. Supp. 3d at 137 n.16 (citing Laffey, 746 F.2d at 30, overruled on other grounds, Save our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516 (D.C. Cir. 1992) (en banc)).  What matters is that the out-of-pocket expenses are both "reasonable" and would be "normally charged to a fee-paying client, in the course of providing legal services."  Laffey, 746

F.2d at 30 (citation omitted); see also Salazar v. District of Columbia, No. 93-452, 2014 WL 12695696, at *14 (D.D.C. Jan. 30, 2014) (reciting this standard).

Despite the expansive briefing on the subject, not much must be said about this issue. Perhaps seeking to make a long Opinion even longer, Defendant has challenged a plethora of discrete entries logged by Plaintiff's attorneys. In response, Lewis reasonably reduced her request, eliminating some of Defendant's objections. See Pl. Reply at 29 (withdrawing fee request for experts and Prashar). With respect to others, Charles Bonner provided a declaration attesting that the categories of costs that raised Defendant's concern were not, in fact, included in the submitted cost bill. See Charles Bonner Reply Decl., ¶ 9 (noting elimination of meals and ground-transportation costs). Lewis also concedes that in a few instances, some meal expenses were inadvertently included in her bill of costs because they were included in lodging bills. Id. She thus "concede[s] that" they "should be deducted." Id. Save for one line item, discussed below, the Court is content with Lewis's claimed costs and expenses following her reasonable concessions. It will not "engage in 'nickel and diming' on this subject" given Plaintiff's "relatively modest" requests and Defendant's "many minor objections." Smith, 466 F. Supp. 2d at 161.

This one exception, however, is significant. Over a quarter of Lewis's expenses derive from an attorney she hired to assist with drafting this Motion. The Court does not find this expense reasonable. Lewis's primary justification for retaining the additional attorney was because she "could marshal the arguments in a much more efficient manner than plaintiff's counsel," and thus the cost of her time "is less than if Plaintiff's merits counsel had been required to research and draft these arguments themselves." Pl. Reply at 29. For this efficiency, Plaintiff requests over $23,000. A glance at Plaintiff's attorneys' time records, however, belies this

contention. Among the three of them — Charles Bonner, Cabral Bonner, and Scrofano — Lewis is requesting just shy of 70 hours of attorney labor to submit a 23-page brief and accompanying attachments. The Court concludes, without any reservation, that the additional 35.5 hours they request for their retained help is not a reasonable litigation expense. Other courts in this district have concluded similarly. See Heller, 832 F. Supp. 2d at 61 ("The Court is aware of no authority allowing an attorney to claim the 'outside legal services' of other attorneys as a reasonable expense of litigation."). Had Lewis included this request for an attorney's time within her fees request — rather than expense report — the Court would have struck the hours as plainly excessive. It sees no reason why the inclusion of this sum within the expense request should yield a different result.

C. Calculation

With the decisionmaking out of the way, one task remains: calculating Defendant's total award. For clarity, the Court will briefly run through the results of the foregoing analysis for each category of fees and list the ensuing award. The charts below aid its task.

1. *Merits Fees*

To determine the appropriate billing rate, the Court will employ the USAO Matrix for 2018–19 and look to the experience category applicable at time of billing. For hours logged by the Bonners prior to the Rule 12(b)(6) Order issued on December 9, 2015, the Court will reduce the requested hours by 50%. So as not to double-count the Bonners' preemptive reduction, the Court, prior to implementing this cut, will add back in the hours they proposed to eliminate for this period. The Court will also reduce Scrofano's trial hours by 75%. All these calculations exclude hours spent on the fees motion, which are addressed in the following subsection.

**Table 1: Merits Fees**

| | Stage of Litigation | Hours Requested | Percent Reduction | Hours Awarded | Rate | Awarded Fees |
|---|---|---|---|---|---|---|
| Charles A. Bonner | Pre-12(b)(6) Order | 97.65 | 50% | 48.83 | $613 | $29,929.73 |
| | Post-12(b)(6) Order, pre-Fees | 444.65 | None | 444.65 | $613 | $272,570.45 |
| A. Cabral Bonner | Pre-12(b)(6) Order | 31 | 50% | 15.5 | $417 | $6,463.50 |
| | Post-12(b)(6) Order, pre-Fees | 35.2 | None | 35.2 | $417 (12/10/2015–5/31/2017) | $14,678.40 |
| | | 383.70 | None | 383.70 | $491 (6/1/2017–present) | $188,396.70 |
| Joseph A. Scrofano | Trial | 28.4 | 75% | 7.1 | $417 | $2,960.70 |
| | All Other | 16.3 | None | 16.3 | $358 (pre 6/1/2016) | $5,835.40 |
| | | 18.6 | None | 18.6 | $417 (post 6/1/2016) | $7,756.20 |
| Legal Assistants | All | 165.85 | None | 165.85 | $166 | $27,531.10 |
| | | | | | **Total:** | **$556,122.18** |

2. *Fees on Fees*

Here, too, the Court will apply the 2018–19 USAO Matrix rates. It has gone through each attorney's (and paralegal's) time entry and segregated out the hours attributable to this fees Motion. Then, based on Lewis's requested billing rates for her counsel, it calculated the fees-on-fees requests. To reflect Lewis's success on this petition, the Court then applied the same reduction to these fees as it ultimately applied to her requests for merits fees — namely, 32%.

**Table 2: Fees on Fees**

|  | Requested Hours | Requested Rate | Total Request | Percent Reduction | Awarded Fees |
|---|---|---|---|---|---|
| Charles A. Bonner | 28.4 | $864 | $24,537.60 | 32% | $16,685.57 |
| A. Cabral Bonner | 35.05 | $724 | $25,376.20 | 32% | $17,255.82 |
| Joseph A. Scrofano | 5.4 | $658 | $3,553.20 | 32% | $2,416.18 |
| Legal Assistants | 1.75 | $202 | $353.20 | 32% | $240.18 |
|  |  |  |  | **Total:** | **$36,597.74** |

### 3. *Costs and Expenses*

Finally, Lewis requests a total of $85,244.41 in costs and expenses but has agreed to eliminate the $5,000 witness fee for Prashar and the $1,250 fee for Kavanaugh. See Pl. Reply at 29; ECF No. 110, Attach. 8 (expense report detailing fees for these individuals); ECF No. 101, Attach. 2 (original expense report listing total request). After the District pointed out that Lewis's bill included a number of meals associated with lodging, Plaintiff conceded that these expenses should be deducted. See Def. Opp. at 42; Charles Bonner Reply Decl., ¶ 9. As the District identified them, these meals total $1,185.19. See Def. Opp. at 42 (listing expenses). The Court will deduct this sum from Lewis's expense request. It will further reduce the reduce the sum by $23,962.50 based on its finding that the hours spent by attorney-fee counsel were unwarranted. The total sum of costs and expenses the Court will award is thus $53,846.72.

### 4. *Total Award*

Adding up the numbers from the three categories identified above yields a total award of $646,566.64.

**III.    Conclusion**

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion for

Attorney Fees.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  December 3, 2018